THE STATE OF OHIO, APPELLEE, *v.* LOCKETT, APPELLANT.

[Cite as State v. Lockett (1976), 49 Ohio St. 2d 48.]

50

(No. 76-424—Decided December 30, 1976.)

*Mr. Stephan M. Gabalac,* prosecuting attorney, and *Mr. Carl M. Layman, III,* for appellee.

*Mr. Max Kravitz, Mr. Gerald Simmons* and *Mr. Bruce Jacob,* for appellant.

CORRIGAN, J.

## I.

Appellant propounds 17 propositions of law in this cause. The following is a summary of the relevant testimony in this court:

Al Parker testified that, prior to coming to Akron on January 14, 1975, he was a resident of Orange, New Jersey. During the weekend prior to coming to Akron, Parker indicated that he met, for the first time, Joanne Baxter and the appellant in Jersey City, New Jersey (Friday, January 10, 1975). Baxter and the appellant, residents of Akron, were visiting the New Jersey area, and were apparently staying with relatives.

As the weekend progressed, Parker introduced Baxter and the appellant to his friend, Nathan Earl Dew. On Monday, January 13, 1975, Dew borrowed $60 from Parker, so that Dew could make bail for the appellant's broth-

er, James Lockett. After James Lockett was released from jail, Baxter, the appellant, David Ford (the appellant's 17-year-old uncle), and James Lockett planned to return to Akron in appellant's car.

Dew and Parker agreed to lead the appellant to the interstate highway for the return trip to Akron. Because of bad weather, Dew and Parker eventually accompanied the group all the way to Akron.

Parker and Dew arrived in Akron on January 14, 1975, with the appellant, James Lockett, Ford and Baxter. After the appellant was taken to the local Methadone Clinic for her heroin substitute, Parker and Dew, along with the others, eventually ended up at the Lockett residence.

Because they had no money to go home, Parker and Dew discussed pawning Dew's ring. When the appellant and James Lockett became part of this conversation (with only Dew, Parker, James Lockett, and the appellant participating), the appellant suggested a robbery. She then proceeded to suggest and point out certain business establishments that might be suitable as a target for the robbery. Because none of the four had a pistol, James Lockett suggested robbing a pawn shop where they could ask to see a pistol, load it, and then use it to rob the pawn shop. Since Parker already had four cartridges in his possession, he was elected to be the triggerman at the suggestion of James Lockett. Appellant offered to lead the group to the pawn shop, but suggested that she not actually go in because the pawn shop operator knew her. After it was determined that the robbery would take place the next day, Dew and the appellant, using Parker's car, dropped Parker off at Baxter's house.

The next morning, January 15, 1975, Dew, James Lockett and the appellant, using Parker's car, picked up Parker at Baxter's apartment. According to Parker, the robbery plan called for Dew and James Lockett to enter Syd's Market Loan, in downtown Akron, ostensibly to pawn Dew's ring. Parker was then to follow, look at a pistol, and carry out the robbery. The appellant was to stay in Parker's car, wait two minutes, and then start the engine.

The actual robbery commenced during the noon hour with Dew and James Lockett entering the pawn shop as planned. Approximately a minute later, Parker left the car and entered the pawn shop. Parker indicated that, when he entered, the owner, Sidney Cohen, was the only person present besides Dew and James Lockett. At Parker's request, Cohen showed him a pistol. Parker returned this pistol, at which point Dew pointed out another pistol, which Parker requested. Parker then took two cartridges out of his pocket, loaded the pistol, and declared that this was a stickup. The gun was pointed at Cohen with Parker's finger on the trigger. Parker testified that the weapon went off when Cohen grabbed at the pistol. As Cohen went down, he activated the robbery alarm behind the counter. The trio ran when Parker indicated that the alarm had been pushed. Parker kept the gun as he ran for his car. The appellant was in Parker's car when he returned. The engine was running, but Dew and James Lockett did not return to Parker's car. Appellant took the gun Parker had taken from the pawn shop and put it in her purse. Parker and appellant proceeded to the home of appellant's aunt, during which time Parker explained to appellant what had happened.

After staying a short time at the aunt's house, Parker and appellant left in a taxi which appellant had called. Parker sat in the back seat on the passenger's side while appellant sat behind the driver. Appellant then proceeded to give the driver directions to her parents' home. The taxi was stopped by a police car approximately three or four blocks from the aunt's house. As the officers approached the taxi, appellant told Parker that the gun was under the seat. Parker and appellant were then taken into custody.

Parker testified that he and the appellant told the police that he was from Chicago and was currently renting a room from appellant's mother. Appellant and Parker were released a short while later and returned to the Lockett residence where they discovered that Dew and James Lockett had also returned home. The police investigation culminated in the arrests of Parker, Dew, James Lockett and the appellant.

The above rendition of facts was presented to the trial court through the testimony of Al Parker. To corroborate this co-defendant's testimony, the state presented the testimony of Ethel W. Garrett, Ronda Reed, Joanne Baxter, Lowell Hayes, Billy Ray Berry and James Gasdaglis.

Mrs. Garrett testified that she was an employee of City-Wide Answering Service. Mrs. Garrett further testified that on January 15, 1975, at 12:51 p. m., she received an alarm from Syd's Market Loan.

Ronda Reed, an employee of the Marine Corps recruiting station near Syd's Market Loan, testified that she was in front of the pawn shop at the time of the robbery and observed inside, three black males and one white man. Further, Reed noticed a shiny object in the hand of one of the black men. After the three black males ran out of the shop, Reed observed one black subject stuffing a gun into his pants.

Joanne Baxter's testimony corroborated that given by Parker concerning the trip from New Jersey to Akron. Baxter further testified that the appellant, on the way to the Methadone Clinic on Tuesday, January 14, 1975, told Dew and Parker that she knew places that they could "knock off." Baxter testified that, on the return trip from the clinic, the appellant proceeded to show the others a market place as a possible robbery target. Baxter stated that the appellant, Dew, Parker and James Lockett met together on Wednesday morning, January 15, 1975, in one of the bedrooms in Baxter's apartment. Finally, she testified that she saw Parker Wednesday evening, at which time he informed her of what had happened at Syd's Market Loan.

Lowell Hayes, a driver for the Yellow Cab Company, testified that on Wednesday, January 15, 1975, at approximately 1:30 p. m., he picked up a man and woman at 168 Nieman Street, Akron, in cab No. 52. Hayes identified the appellant as the woman in question. Hayes then testified that the appellant gave him directions to Tarbell Street which would have been a longer ride than the normal route. Further, Hayes testified that the normal route from Nieman to Tarbell would have put the cab closer to Syd's Market

Loan than the route specified by appellant. Finally, Hayes testified that the appellant first sat in the middle of the back seat, but moved directly behind him when the cab was stopped by the police. Hayes then drove back to the cab company, checked his cab in and left work for the day at approximately 2:00 or 2:30 p. m.

Billy Ray Berry, at that time a driver for the Yellow Cab Company, testified that on Wednesday, January 15, 1975, at about 2:30 p. m., he recovered a gun from under the rear of the front seat (driver's side) from cab No. 52. James Gasdaglis testified that he took the gun away from Berry and turned it in to Mr. Edick, at the cab company's office, who, in turn, gave it to the police.

By stipulation, it was determined that Sidney Cohen died from a single gunshot wound. The gun causing the wound was stipulated to have been part of the inventory at Syd's Market Loan.

Appellant, in her defense, attempted to present the testimony of Nathan Earl Dew and James Lockett. Both Dew and Lockett immediately invoked their Fifth Amendment privilege, with their attorneys present.

*II.*

Appellant's propositions of law Nos. 1, 2 and 3 relate to alleged errors in the *voir dire* examination of prospective jurors.

Appellant argues that the trial court:

(1) Erred on *voir dire* examination by permitting inquiry into the scruples of individual jurors regarding the imposition of capital punishment;

(2) erred in allowing the prosecutor to inform prospective veniremen that a sentence of death is only a possibility in the instant case; and

(3) erred by conducting only insufficient and cursory inquiry in the *voir dire* examination and improperly conducting the *voir dire* so as to impair the attempt to select a fair and impartial jury.

Appellant argues that it was error to inquire into the personal convictions of jurors regarding the imposition of capital punishment. Appellant maintains that, under Ohio's new sentencing procedure in capital cases, the decision as

to whether a defendant lives or dies is removed from the jury, and the jury's only function under this statutory scheme is to adjudicate guilt or innocence. Appellant maintains that death qualification in jury selection is disallowed because the jury is no longer concerned with imposing punishment.

This court recently held, in paragraph two of the syllabus in *State* v. *Bayless* (1976), 48 Ohio St. 2d 73:

"In a prosecution for aggravated murder with specifications, a potential juror may be disqualifiied on *voir dire* if the trial court is satisfied from the inquiry that the juror will not render an impartial finding according to law as to the defendant's guilt or innocence, both of the charge and of the specifications."

The court, in *Bayless,* pointed out the necessity of inquiring into prospective jurors' scruples and opinions concerning capital punishment. The record of the *voir dire,* in *Bayless,* as well as in the present case, illustrates that the attitudes held by many individuals concerning capital punishment, both opposed and in favor, would prevent them from fairly and impartially applying the law, as given in the court's instruction, to the facts as they are presented. An inquiry into the opinions, and attitudes of prospective veniremen is not only proper, but essential, in order to expose prejudices and bias that might prevent a fair and impartial adjudication of guilt or innocence.

An examination of the record of the *voir dire* in the present case discloses that at least four prospective jurors were excused for cause, each of whom stated that they could not take an oath or affirm that they would well and truly try the case upon the evidence presented and follow the law as given to them in the court's instructions, knowing that a finding of guilty of the charge and one or more of the specifications might result in a death sentence. No prospective juror was discharged for cause solely because he voiced a general objection to the death penalty. In fact, in one instance, a prospective juror, who voiced general objections but stated that she could and would take the oath, was not excused for cause. The record reveals no violation

of the rule established in *Witherspoon* v. *Illinois* (1968), 391 U. S. 510. Appellant's first argument is without merit.

Appellant's second argument is that the mention by the prosecution that the death penalty was only a possibility resulted in a jury uncommonly willing to convict.

That statement by the prosecution was a totally accurate statement at the time it was made, *i. e.*, prior to trial. A determination of guilt of the charge, and of at least one of the specifications, and a determination by the trial court as to the lack of mitigating circumstances is necessary before imposition of the death penalty is mandated. As to appellant's belief that the prosecution's comment resulted in a jury uncommonly willing to convict, we believe it is unrealistic to assume that prospective jurors would not be aware of the fact that a guilty verdict on the charge and the specifications, in effect, every determination required of the jury, would not result in the imposition of the death penalty. Appellant's argument is without merit.

Finally, an examination of the record of the *voir dire* does not reveal that the trial court erred in conducting an insufficient and cursory examination into the opinions and attitudes of prospective jurors on the issue of capital punishment. The court and the prosecution explained to each juror the necessity of taking an oath that they would well and truly try the case against the accused and follow the law as given to them by the court. The trial court excused only those prospective jurors who stated that they definitely could not take or follow this oath, knowing that the death penalty might be imposed upon a finding of guilt. No juror was excused for cause solely because he expressed a general objection to capital punishment. These three propositions of law are rejected.

### III.

Appellant maintains, in her proposition of law No. 4, that it was plain error and denial of due process for the trial court to impanel prospective veniremen who, it is alleged, repeatedly stated on *voir dire* that they could not divorce themselves from pre-trial publicity.

An examination of the record of the *voir dire* in this

case reveals that those jurors who had read of the robbery-murder all stated that they could, and would, judge the defendant solely upon the law and evidence presented at the trial and upon no outside source of information. We find no error in the record to show that any member of the jury was disqualified to sit because of pre-trial publicity. This proposition of law is overruled.

### IV.

Appellant maintains in her fifth and sixth propositions of law that the state failed to prove beyond a reasonable doubt that the principal offender, Al Parker, had a purposeful intent to kill and that the accomplices shared that purpose pursuant to R. C. 2903.01(B).

R. C. 2923.03 reads, in pertinent part:

"(A) No person, *acting with the kind of culpability required for the commission of an offense,* shall do any of the following:

"* * *

"(2) Aid or abet another in committing the offense." (Emphasis added.)

R. C. 2903.01(B), the aggravated murder statute under which appellant was charged as an aider and abettor, provides:

"No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary or escape."

R. C. 2901.22(A) defines the culpable mental state of purpose, as follows:

"A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

It is clear from this statute and the decisions construing the prior existing first degree murder statute that Ohio does not adhere to the strict felony-murder rule. It has

long been recognized that intent or purpose to kill is an essential element of the crime of first degree murder in this state. *Robbins* v. *State* (1857), 8 Ohio St. 131; *State* v. *Farmer* (1951), 156 Ohio St. 214.

The appellant contends, in proposition of law No. 5, that the state failed to prove that the principal offender had a purposeful intent to kill. We disagree.

The record in this case establishes that the appellant, Sandra Lockett, and her companions, the triggerman, Al Parker, James Lockett and Nathan Dew, agreed upon a common plan to rob the victim, Sidney Cohen. The appellant pointed out the place to be robbed and waited in a car outside while the robbery took place because she was afraid she might be recognized. Prior to the robbery, the participants had planned to use a gun which they would acquire in the victim's pawnshop. They were all aware that Parker had the bullets which they planned would be used to load the gun. The evidence clearly establishes a common plan to use a deadly weapon in the commission of the robbery of the victim.

The testimony of the triggerman, Parker, was that he took the bullets from his pocket and put them into a gun taken from the pawnshop display case. He testified further that, as he pointed the gun at the victim for the purpose of robbery, the victim grabbed for the gun and, in so doing, the gun was fired and he was killed. Parker admitted that his finger was on the trigger before the gun was fired. A substantial part of his testimony was confirmed by an employee of a nearby office who happened to be looking into the pawnshop at the time the killing took place.

It is well established in Ohio that "* * * one may be presumed to intend results which are the natural, reasonable, and probable consequences of his voluntary act * * *" (*State* v. *Farmer, supra,* at page 223), and "* * * [i]f the use of a weapon, likely to produce death or serious bodily harm, results in death, such use, in the absence of circumstances of explanation or mitigation, may justify a determination beyond a reasonable doubt that there was an intent to kill." (*Id.,* at page 222.)

The evidence introduced by the state in this cause

established that the participants in the Cohen robbery-homicide entered into a common design to rob the decedent's store by the use of force, violence and a deadly weapon. All the participants were aware that an inherently dangerous instrumentality was to be employed to accomplish their felonious purpose. The murder of the proprietor was a natural and probable consequence of the execution of a common plan, which, in itself, was inherently dangerous to human life. The record contains sufficient evidence upon which a jury could find a purposeful intent to kill, and this court can not alter that finding in the absence of evidence tending to rebut or mitigate the existence of that intent.

The second part of appellant's argument states, alternatively, that, although the principal offender may have had a purpose to kill, the record contains no evidence that the appellant shared that purpose, as required by R. C. 2923.03 (A)(2).

Our previous examination of the record established the common plan to commit robbery by the use of a deadly weapon. The appellant was an active participant at all stages of the conspiracy and was, in fact, the leader in selecting the decedent's place of business for robbery.

Appellant's only divergence in participation arises from the fact that she waited outside the pawnshop in a car to avoid recognition and was not present in the store at the time of the killing.

Ohio's complicity statute, R. C. 2923.03(A)(2), as previously discussed, requires that aiders and abettors share the culpable mental state required for the commission of the principal offense. Appellant contends that this requirement supersedes pre-existing case law. We disagree.

The Legislative Service Commission Committee Comments to the complicity section point out that this section codifies existing case law with respect to aiding and abetting.

In *State* v. *Doty* (1916), 94 Ohio St. 258, this court held:

"Where * * * [an] unlawful act was contemplated in the original conspiracy, although not identical with or similar to the criminal act charged, if the conspired unlawful

act and the manner of its performance would be reasonably likely to produce death, each conspirator is equally guilty with the principal offender, as an aider and abettor in the homicide, although such aider and abettor was neither present nor had knowledge of the physical killing or of the weapon used.''

This court, in *Doty*, at page 265, explained that "* * * where the conspiracy in its origin may have intended the commission of an unlawful act of violence, although not identical with or similar to the criminal act charged, still if that common purpose resulted in the killing, and if the manner of performance of the criminal act conspired could have been reasonably contemplated as likely to produce death, in that event the coconspirators are equally criminally guilty with the principal. * * *'' See, also, *Goins* v. *State* (1889), 46 Ohio St. 457; *Stephens* v. *State* (1884), 42 Ohio St. 150.

Several recent appellate court decisions have followed this rule. The syllabus in *State* v. *Palfy* (1967), 11 Ohio App. 2d 142, states:

"1. A person engaged in a common design with others to rob by force and violence various individuals of their property is presumed to acquiesce in whatever may be reasonably necessary to accomplish the object of the enterprise; and if, under the circumstances, it might be reasonably expected that the victim's life would be endangered by the manner and means of performing the criminal act conspired, each one engaged in the common design is bound by the consequences naturally or probably arising in its furtherance and, in case of death, would be guilty of homicide.

"2. If the conspired robbery, and the manner of its accomplishment, would be reasonably likely to produce death, each plotter is equally guilty with the principal killer, as an aider and abettor in the homicide, even though the aider and abettor was not aware of the particular weapon used to accomplish the killing. An intent to kill by the aider and abettor may be found to exist beyond a reasonable doubt under such circumstances.''

In *State* v. *Trocodaro* (1973), 36 Ohio App. 2d 1, the

Court of Appeals for Franklin County stated, in paragraph two of the syllabus:

"Where it has been determined that a criminal conspiracy existed with regard to the commission of a crime, it need not be proved that an aider or abettor possessed those individual elements needed to establish the crime against the perpetrator."

The distinction between these cases holding an aider or abettor liable as a principal if he is constructively present at the commission of a crime and those cases which require proof of the aider's intent as separated from that of the principal, or proof that the aider knew the perpetrator had the intent to kill (*Woolweaver* v. *State* [1893], 50 Ohio St. 277; *Coffin* v. *United States* [1896], 162 U. S. 664), lies in the existence of a prior criminal conspiracy.

Clearly, the record indicates that Parker's intent was to use whatever means reasonably necessary to accomplish the robbery of Sidney Cohen by means of force, violence and the use of a deadly weapon. Under these circumstances a killing might be reasonably expected.

The record establishes that the appellant participated in the planning and commission of the robbery and acquiesced in the use of a deadly weapon to accomplish the robbery. Under these circumstances, it might be reasonably expected by all the participants that the victim's life would be endangered by the manner and means of performing the act conspired.

Therefore, the appellant, as well as the other participants, is bound by all the consequences naturally and probably arising from the furtherance of the conspiracy to commit the robbery. The record reflects that this was the case and establishes beyond a reasonable doubt that the appellant had a purposeful intent to kill.

## V.

Appellant maintains, in her proposition of law No. 7, that the trial court's instructions to the jury on the charge of involuntary manslaughter and the failure to instruct on the defense of accident, represented plain error substantially affecting the rights of the accused.

Crim R. 30 states, in part:

"A party may not assign as error the giving or the failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

The appellant, herein, failed to object to the court's charge on involuntary manslaughter and to the alleged failure to instruct on the defense of accident, and under Crim R. 30 those objections are waived.

The appellant urges, however, that under Crim. R. 52 (B) the court's charge on involuntary manslaughter and alleged failure to instruct on the defense of accident constitute plain error affecting substantial rights of the defendant and may be noticed on appeal.

Our examination of the record reflects that the trial court's charge on involuntary manslaughter was adequate in that it instructed the jury that, if the killing were not done purposely but the other elements were found, then the defendant would be liable for a charge of involuntary manslaughter. The record further reflects that the court's charge on the element of purpose and the necessity of the state proving it beyond a reasonable doubt also discusses and explains the absence of such purpose as constituting accidental killing. We do not find error on the face of the charge, and, in view of the appellant's waiver under Crim. R. 30, this proposition is not accepted.

## VI.

Appellant's propositions of law Nos. 8 through 11 challenge the constitutionality of Ohio's statutory scheme for imposition of capital punishment.

This court's decision in *State* v. *Bayless, supra* (48 Ohio St. 2d 73), held Ohio's statutory framework for the imposition of capital punishment constitutional and not violative of either the Eighth or Fourteenth Amendments to the United States Constitution, and those issues need not be reconsidered here. Propositions of law Nos. 8 through 11 are overruled.

## VII.

Appellant's proposition of law No. 12 asserts that the

appellant's Sixth Amendment right to choice of counsel was denied when the trial court refused to grant a continuance to allow retained counsel to prepare for trial.

The record in this cause reflects the fact that competent counsel were appointed by the state to defend the appellant. Appellant claims that, on the day prior to trial, a continuance was sought on the basis that additional counsel had been retained and that he desired additional time to prepare for trial. The record does not reveal whether or not other counsel had, in fact, been retained. Since appellant was represented by competent counsel at that time, it was within the sound discretion of the trial court to deny appellant's motion for a continuance. See *Thurston* v. *Maxwell* (1965), 3 Ohio St. 2d 92. This proposition of law is without merit.

## VIII.

Appellant's proposition of law No. 13 asserts that the absence from the courtroom of the attorney in charge of the defense during critical stages of the trial violated the appellant's right to counsel under *Gideon* v. *Wainwright* (1963), 372 U. S. 335.

The record reveals that appellant was represented at every stage of the proceedings by competent counsel, and the alleged denial referred to consisted of a temporary absence of one of the two appointed counsel representing appellant. The record reveals that appellant's appointed counsel competently represented her. This proposition of law is unmeritorious.

## IX.

Appellant's proposition of law No. 14 asserts that trial counsel were ineffective, and, as a result, appellant was deprived of her Sixth Amendment right to counsel.

Appellant maintains that trial counsel failed to make objections at certain stages of the *voir dire* and at trial. Clearly, the mere failure to make objections which seem appropriate after the fact does not establish reversible error.

Our examination of the record reveals that defense counsel performed conscientiously and, at least, as well

as a lawyer with ordinary training and skill in the criminal law. Defense counsel investigated and asserted all the apparently substantial defenses that were available to the defendant in the face of the evidence presented against her. This proposition of law is unacceptable.

## X.

Appellant's proposition of law No. 15 asserts that appellant was denied a fair trial and due process of law by reason of misconduct of the prosecutor during the course of the trial.

Our examination of the record fails to reveal any inflammatory statements or conduct prejudicial to the rights of appellant. The statements made by the prosecutor to the effect that the evidence against appellant was uncontradicted and unrefuted does not constitute a comment by the prosecutor upon the failure of the defendant to testify, prejudicial to appellant's right to a fair trial. This proposition of law is rejected.

## XI.

Appellant, in her proposition of law No. 16, alleges that the sentencing stage in Ohio's statutory framework for the imposition of capital punishment is unconstitutional for the reason that the mitigation hearing following conviction for aggravated murder with specifications requires the defendant to prove by a preponderance of the evidence why she should not be executed, thus shifting the burden of proof to the defense.

Appellant's argument misconstrues Ohio's statutory sentencing procedures. Appellant's argument would have the state prove the proper punishment. Clearly, the introduction of mitigating circumstances has traditionally been a defense function. What appellant fails to perceive is the fact that her guilt has already been proven by the time of the mitigation stage of the proceedings. The mitigating circumstances listed in R. C. 2929.04(B) relate to the lessening of punishment and are far broader than affirmative defenses which the defense must prove in order to excuse or otherwise justify the commission of an offense.

We find no constitutional conflict in imposing the

burden of proving mitigation of punishment on a defendant already adjudged guilty of the commission of a capital offense. This proposition of law is without merit.

*XII.*

Appellant's proposition of law No. 17 asserts that the trial court should not have imposed the death penalty in this case, because the offense was primarily the product of a mental deficiency, under R. C. 2929.04(B)(3):

R. C. 2929.04 states, in pertinent part:

"* * *

"(B) Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a prepondence [preponderance] of the evidence.

"* * *

"(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity."

Appellant's counsel maintain that the record indicated that the appellant was on the borderline of mental retardation, under the influence of methadone and subject to undue influence by others. Appellant's counsel urge that these factors establish the fact that the appellant was mentally deficient to such a degree that the death penalty should have been precluded.

The evidence before the court consisted of the mental evaluations of the appellant performed by Michael Hungerman, Ph. D. in psychology, Dr. Martin J. Gunter, psychiatrist, and Dr. Abdon E. Villalba, psychiatrist, which were entered into the record by agreed stipulations.

These evaluations were contradictory in relation to the estimation of appellant's I. Q. One evaluation rated the appellant to have an average to slightly above average intelligence; another rated appellant in the low average range of I. Q., while the third evaluation determined that

the appellant's I. Q. was in the range of borderline mental retardation.

Although one of the experts testified that the appellant was subject to undue influence by other people, all the examiners concluded that the appellant was not suffering from a mental deficiency and that her participation in the aggravated murder and robbery of Sidney Cohen was not primarily the product of a psychosis or mental deficiency.

On the basis of this record we conclude that the appellant failed to meet the burden of proving by a preponderance of the evidence that mitigating circumstances existed such as to preclude the imposition of capital punishment. This proposition of law has no merit.

XIII.

For the reasons expressed in this opinion the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

HERBERT, CELEBREZZE and P. BROWN, JJ., concur.
O'NEILL, C. J., STERN and W. BROWN, JJ., dissent.

STERN, J., dissenting. The prohibition in the Eighth Amendment against "cruel and unusual punishments" has been held to impose two limitations upon legislative imposition of penalties for criminal acts.

"First, the punishment must not involve the unnecessary and wanton infliction of pain * * *. Second, the punishment must not be grossly out of proportion to the severity of the crime." (Citations omitted.) *Gregg* v. *Georgia* (1976), —— U. S. —— 49 L. Ed. 2d 859, 875. In this case, the defendant has plainly been proved guilty of being an accomplice to armed robbery. I cannot agree, however, that she may constitutionally be put to death for committing that act, solely because of a presumption that she is thereby guilty of the aggravated murder committed by the principal in this crime. There was no evidence that the defendant or the other participants in the robbery had an actual purpose or intent to kill Sidney Cohen, and the

triggerman, Al Parker, testified as the state's principal witness that the shooting was unintentional. Nevertheless, the jury was instructed that:

"A person engaged in a common design with others to rob by force and violence an individual or individuals of their property is presumed to acquiesce in whatever may reasonably be necessary to accomplish the object of their enterprise. And if under the circumstances it may be reasonably expected that the victim's life would be in danger by the manner and means of performing the criminal act inspired, each one engaged in the common design is bound by the consequences naturally or probably arising in its furtherance.

"If the conspired robbery and the manner of its accomplishment would be reasonably likely to produce death, each plotter is equally guilty with the principal offender as an aider and abettor in the homicide, even though the aider and abettor was not aware of the particular weapon used to accomplish the killing. An intent to kill by an aider and abettor may be found to exist beyond a reasonable doubt under such circumstances."

Under these instructions, the jury had, of logical necessity, to find the defendant guilty of aggravated murder if it found that Al Parker had a purpose to kill.

In virtually any scheme to commit aggravated robbery, "it may be reasonably expected that the victim's life would be in danger by the manner and means of performing the criminal act," for one of the elements of aggravated robbery is that the principal offender "[h]ave a deadly weapon or dangerous ordnance as defined in Section 2923.11 of the Revised Code on or about his person or under his control;" or "[i]nflict, or attempt to inflict serious physical harm on another." R. C. 2911.01. The result of the judicial presumption stated in the jury's instructions and approved by the court is, in effect, that virtually any accomplice to aggravated robbery is automatically liable for aggravated murder with specifications and for the death penalty, regardless of whether he or she had any actual intent or purpose to kill, whenever one of the participants in the robbery purposely kills someone. By judicial pre-

sumption, the court is imputing the guilt of a murderer upon one who would otherwise be guilty only of aggravated robbery, and is affirming the imposition of the death sentence on the basis of that imputed guilt.

I recognize that past Ohio cases have reached this result. *Black* v. *State* (1921), 103 Ohio St. 434; *State* v. *Doty* (1916), 94 Ohio St. 258; *Woolweaver* v. *State* (1893), 50 Ohio St. 277; *Goins* v. *State* (1889), 46 Ohio St. 457. However, these cases were decided before the enactment of the new Ohio Criminal Code in H. B. 511. The prior statute, R. C. 1.17, provided that "[a]ny person who aids, abets, or procures another to commit an offense may be prosecuted and punished as if he were the principal offender." This statute made no mention of the *mens rea* of an aider and abettor, and the court's judicial construction of Ohio law to require none therefore had a sound basis. The present statute, to the contrary, specifically adds language requiring proof of mental culpability. R. C. 2923.03(A) provides that:

*"No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:*

"* * *

"(2) Aid or abet another in committing the offense." (Emphasis added.)

The additional statutory language has no effective meaning if the present law is held in fact to require no proof of culpability. The actual meaning of this change in the statute is shown by R. C. 2901.21, which provides that, except in cases of strict criminal liability, "a person is not guilty of an offense unless * * * [h]e has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense." The clear meaning of this section, as applied to a case of aggravated murder, is that a person is not guilty of aggravated murder unless he has the requisite culpability, which is that he acted purposely. Under R. C. 2901.-22, "[a] person acts purposely when it is his specific intention to cause a certain result. * * *"

The major prosecution argument opposing this con-

struction of the statute is that the committee comment to R. C. 2923.03 states that "[i]n essence, this section codifies existing case law with respect to 'aiding and abetting.'" This general statement can not, however, control over the specific language of the statutes actually adopted, nor can it be taken to have weakened the statutory mandate that "Sections of the Revised Code defining offenses shall be strictly construed against the state, and liberally construed in favor of the accused." R. C. 2901.04(A). The most reasonable construction of these statutes is that an aider and abettor, who is prosecuted and punished as if he were a principal offender, must be proved to have the culpability required as an element of that offense, in the same manner as the principal offender. In cases such as this, involving the death penalty for aggravated murder with specifications, this construction of the statutes is not only correct, but it is also constitutionally mandated, for otherwise the imposition of the death penalty upon an aider and abettor would run afoul of the Eighth Amendment.

I certainly agree that aggravated robbery is a serious crime for which the stringent statutory penalty of up to 25 years imprisonment is fully justified, and I believe that an accomplice in a case such as this would be guilty of involuntary manslaughter under R. C. 2903.04. Further, if an accomplice actually shares the purpose and intent to kill, and that purpose is proved as an element of the offense beyond a reasonable doubt, the accomplice is equally guilty and should be held liable to receive the death penalty in the same manner as the actual killer. But I also believe that the death penalty may constitutionally be applied only for the most serious of crimes, very possibly only for the act of murder itself, and that it is disproportionate to the offense when imposed for a lesser crime.

A conclusive judicial presumption that one person had the specific intent to commit murder, because his confederate had such intent, necessarily will result in some accomplices to aggravated robbery receiving the statutory punishment for aggravated robbery, while others, for the same acts, will be sentenced to death because of the acts and

purposes of others. The imposition of the death penalty in the latter cases is both arbitrary and grossly disproportionate to the crime.

I would hold that a trial court in a capital case under the present statute may not constitutionally presume that an accomplice shares a principal offender's purpose to kill, and would hold that the fact must be proved beyond a reasonable doubt, under all the circumstances, in the case of an accomplice as well as in that of a principal. For that reason, I would reverse the verdict of guilt on the charge of aggravated murder, with specifications, and affirm the verdict of guilt of aggravated robbery.

O'NEILL, C. J., and W. BROWN, J., concur in the foregoing dissenting opinion.