This is an appeal from a judgment of the Lucas County Court of Common Pleas which, following a jury trial, found appellant Arkyndu Brown guilty of one count of aggravated murder and one count of aggravated robbery with firearm specifications attached to each count. For the reasons that follow, this court affirms the judgment of the trial court.
Appellant sets forth the following assignments of error:
"First Assignment of Error
 "Defendant-Appellant's Convictions are Supported by Insufficient Evidence and are Therefore a Denial of Due Process.
"Second Assignment of Error
 "Defendant-Appellant's Convictions are Against the Manifest Weight of the Evidence."
The facts that are relevant to the issues raised on appeal are as follows. On July 28, 1996, just after midnight, Sameh Hammad was shot and killed while sitting in his car outside the AM Carryout, located on the corner of Bancroft and Clinton Avenue in Toledo. Hammad owned the store and had just closed it for the night. Hammad suffered three gunshot wounds. On April 30, 1997, appellant was indicted for aggravated murder and aggravated robbery in connection with Hammad's death. Appellant's friend, Quoron Williams, also was charged with aggravated murder and aggravated robbery in connection with the murder with a death penalty specification in his indictment. The state subsequently agreed to drop the death penalty specification in Williams' indictment in exchange for Williams' testimony against appellant. Appellant was charged with complicity in the commission of both offenses, with no death penalty specification. On September 8, 1997, the case proceeded to trial and the following relevant evidence was presented.
George Jones testified that on July 28, 1997, sometime between midnight and 1:00 a.m., he was driving in the vicinity of Bancroft and Clinton Streets when he turned the corner and his shovel fell out of his pick-up truck. When he stopped to get the shovel, he saw two men running across Clinton Street. Jones saw the men from the back and could not ascertain their race.
Officer John Palmer, Toledo Police Department, testified that he was called to the scene of the shooting. When Palmer and his partner arrived at the carry-out, he saw a car in the small lot in front. There were no other people or cars nearby. When Palmer approached the car, he saw glass on the ground that appeared to have come from the driver's side window. Palmer then saw the victim slumped over in the driver's seat. When the fire department rescue personnel arrived, they declared Hammad dead at the scene.
Dr. Diane Scala-Barnett, deputy coroner for the Lucas County Coroner's Office, testified that she performed an autopsy on Hammad. She stated that she observed three gunshot wounds to Hammad's body — two in his arm and one in his side. She further testified that the marks left by gunpowder on the victim's shirt indicated to her that the shots were fired from about eighteen to twenty-four inches away from the body.
Detective Terry Lee Cousino, Toledo Police Department Scientific Investigations Unit, testified that he responded to the scene of the shooting during the early morning hours of July 28, 1997. Cousino stated that he took photographs and examined the scene for physical evidence. He did not find any shell casings or weapons. Cousino testified that he found a partial palm print on the chrome strip just below the driver's door on the exterior of the car. The print was identified as that of Quoron Williams. Cousino did not find any other usable prints.
Quoron Williams was called as a witness for the state. Williams testified that he killed Sameh Hammad and that when he did so appellant was with him. Williams stated that before he and appellant killed Hammad they had been at a friend's house. Both of them had been drinking beer and smoking marijuana. When they left their friend's house they were going "nowhere in particular." As they walked around, they talked about robbing someone. Williams at that time had a .22 caliber handgun in his possession and testified that appellant knew he had the gun because Williams showed it to him. Williams did not recall whose idea it was to rob someone but said that they both agreed to do it.
Williams further testified that as he and appellant walked along Bancroft Street, they saw Hammad at the side door of his store sweeping. Williams decided to rob Hammad and told appellant, who agreed to the plan. The original plan was to go into the store to rob Hammad, but when appellant went up to the door and found it locked, they talked about waiting until Hammad came out. Appellant walked around to the back to see if there was anyone there. Appellant stayed in the back and Williams stayed out front. When Hammad came out, Williams went around back and the two of them came around the side together. They were going to rob Hammad as soon as he came out, but he got into his car before they could do that, so they "rushed the car." Appellant tried to open the car door but could not because it was locked. Williams saw Hammad looking at them and then Williams started shooting. Williams stated that he fired three times. Hammad tried to get up but fell over. With appellant standing beside him, Williams reached in and took money from Hammad's pockets. The two men ran to a friend's house where they counted the money they had stolen from Hammad. After they counted the money, they heard sirens and Williams left. Appellant did not leave at that time. Williams and appellant had talked about meeting later on at someone else's house but they never did because Williams was afraid to go there. After Williams left the first friend's house that night, he bought some beer and marijuana with the money they had stolen, and then went to another friend's house. He saw appellant later that night but they did not talk about the murder. Williams further testified that a few days later the police caught him driving a stolen car. At that time he had in his possession the gun he had used to kill Hammad.
Williams testified that he initially told a detective that appellant had shot Hammad and that appellant had reached into the car and taken the money. He testified that as soon as he said appellant shot Hammad, he broke down and cried and told the detectives that was not true and that he had done the shooting.
Joanne Person testified that she has several theft convictions on her record and several convictions for falsification. She stated that she has used crack cocaine and had done so on or about July 28, 1996. Person testified that in the early morning hours of July 28, 1996, while standing in front of a crack house across the street from the carryout, she saw Hammad sweeping the parking lot in front of his store. She further testified that she also saw Williams and appellant come from the alley behind the store. She saw a weapon. One of them told her to get out of there because something was going to "go down." Person testified that she started to walk away and heard someone say something like "Open the door." She then heard three shots. Person continued walking and then saw Williams and appellant running. Person later walked back by the store and saw Hammad slumped over in his car. Person then saw people start to gather to see what had happened. She was there when the police arrived but did not stay to give any information. She testified that she went to California shortly thereafter and returned to Toledo to testify in this case and another. She further testified that she was not high when she witnessed the events outside Hammad's store.
A day or so after the shooting, Person saw appellant and asked him what had happened the other night. She testified that appellant told her, "We had to kill the motherfucker." Person did not ask any other questions. She further testified that no promises had been made to her by the state in exchange for her testimony in this case.
Detective David Mullin, Toledo Police Department, testified that he was assigned to investigate Hammad's murder. Mullin stated that he first spoke to appellant on August 2, 1996. Mullin explained appellant's Miranda rights and appellant signed a waiver of those rights. Mullin stated that he then told appellant he wanted to interview him in connection with Hammad's murder. He further testified that appellant did not ask at any time to have an attorney present. Mullin stated that appellant told him that he had nothing to say about the murder. He told the detective that he was a couple of houses away when it happened and that he heard the gunshots. Appellant told the detective he did not want to say anything else and the interview concluded.
The state rested and the defense called one witness. Melton Boykin testified that he recalled July 28, 1996 clearly because it was the date of a family picnic at his house. Boykin stated that he clearly recalled the date of the picnic because it was in celebration of his wife's birthday and had to be postponed from the original date of Saturday, July 20, due to rain. Boykin stated that he and about sixty members of his family and friends gathered at his house in the early evening and he started cooking outside. He further testified that he knows appellant and that he saw him and spoke to him that afternoon. Boykin did not see appellant again until about 8:30 or 9:00 that night when appellant came to Boykin's party looking for Boykin's daughter. At about 11:00, Boykin saw appellant outside with a group of people. He recalled that appellant left the party at about 11:15 and said he saw appellant return sometime after midnight with Boykin's cousin. He also saw appellant there at around 1:15 or 1:30 a.m. and again around 3:00 a.m.
The state presented David Carlson as a rebuttal witness. Carlson testified that he is a weatherman for a local television station and said that, based on data compiled by the National Climatic Data Center, there was no rainfall on Saturday, July 20, 1996.
On September 11, 1996, the jury returned a verdict of guilty of one count of aggravated murder in violation of R.C.2903.01(B) with a firearm specification and guilty of one count of aggravated robbery in violation of R.C. 2911.01(A)(1) with a firearm specification. On September 15, 1997, appellant was sentenced to a term of life with parole eligibility after a full twenty years in prison on the aggravated murder conviction and to a term of ten years on the aggravated robbery conviction, with the sentences to be served consecutively. Appellant was also sentenced to two one-year terms of actual incarceration on the firearm specifications, which were merged and ordered served concurrently to each other and consecutively to the aggravated murder and aggravated robbery sentences.
In his first assignment of error, appellant asserts that his convictions were not supported by sufficient evidence. Appellant questions Quoron Williams' credibility in light of the agreement he made with the state to remove the death penalty specification from his indictment for Hammad's murder in exchange for his testimony at appellant's trial.
R.C. 2903.01(B), aggravated murder, provides that:
 "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery or robbery * * *."
R.C. 2911.01(A)(1), aggravated robbery, provides that:
 "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *."
R.C. 2923.03, complicity, states in relevant part:
 "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 "(1) Solicit or procure another to commit the offense;
 "(2) Aid or abet another in committing the offense;
 "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code * * *."
"Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a verdict as to all elements of an offense. Id. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine
 "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
The state presented the testimony of Quoron Williams that he and appellant talked about robbing someone while they walked around the neighborhood the night of the murder. This testimony provides sufficient evidence for a finding of complicity under R.C. 2923.03(A)(3). Williams testified that they decided to rob Hammad and waited for him to come out of the store in order to carry out their plan. Appellant stood by Williams' side as Williams shot Hammad three times and remained there while Williams went through Hammad's pockets for money. We therefore conclude that sufficient evidence was presented from which, when viewed in a light most favorable to the prosecution, any rational trier of fact could have found that appellant conspired with Quoron Williams to purposely cause the death of Sameh Hammad while committing aggravated robbery. Accordingly, appellant's first assignment of error is not well-taken.
In his second assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence because there was no "demonstration" that appellant helped in the murder or robbery or that he had the ability to exercise any control over the weapon.
Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence:
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 388, citing Tibbs v. Florida
(1982), 457 U.S. 21, 42.
To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
As for appellant's argument that the state failed to show that he helped in the murder and robbery, we find that claim without merit. A jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design and the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or knew that the felony and the manner of its accomplishment would be reasonably likely to produce death.State v. Lockett, (1976), 49 Ohio St.2d 48, paragraphs three and four of the syllabus. The state in this case presented evidence showing appellant's complicity and his awareness that Williams had a handgun with him. Further, Quoron Williams testified that appellant stood by his side while the robbery and murder were carried out. He also testified that appellant tried to open the car door before Williams shot Hammad through the closed window. We have thoroughly reviewed all of the evidence in this case and find no indication that the trier of fact lost its way or created a manifest miscarriage of justice by finding appellant guilty of complicity in the aggravated murder and aggravated robbery of Sameh Hammad. Accordingly, appellant's second assignment of error is not well-taken.
On consideration whereof, this court finds that substantial justice was done the party complaining and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.