DECISION.
On July 9, 2000, Bubacarr Kassama was shot to death. Defendant-appellant Sonya McKibbon was subsequently arrested for the shooting. She was charged with aggravated murder in violation of R.C.2903.01(B), aggravated robbery in violation of R.C. 291101(A)(1), aggravated robbery in violation of R.C. 2911.01(A)(3), and felonious assault in violation of R.C. 2903.11(A)(2). Each charge was accompanied by firearm specifications. Following a jury trial, McKibbon was convicted on all counts and specifications.
The trial court sentenced McKibbon to life in prison for the aggravated murder, with the possibility of parole after twenty years, to be served consecutively with and subsequent to a three-year mandatory sentence on the firearm specifications. The trial court merged the firearm specifications for the purpose of sentencing. The trial court also sentenced McKibbon to eight years for each aggravated robbery and to six years for the felonious assault. McKibbon now appeals, asserting three assignments of error. Because we find none of the assignments to be well taken, we affirm the judgment of the trial court.
 I. FACTS
On the evening of July 8, 2000, McKibbon left her four young children in the care of a nephew at her apartment on Fulton Avenue in Cincinnati. She walked to a bar on McMillan Avenue with fifteen-year-old Desiree Jones, Lydia Frazer, who was a neighbor, and Lydia's male friend. At the bar, the group met Merrow Cole, who was McKibbon's boyfriend and Jones's cousin. While they were at the bar, a fight broke out between McKibbon, Jones, and another woman. McKibbon and Jones left the bar with Cole, after he had been cut on the side of his stomach with a broken piece of glass.
The three then went back to Frazer's apartment, where Frazer cleaned and bandaged Cole's wound. After Cole's wound was patched, he and McKibbon walked across the hallway to the apartment they shared with McKibbon's children, while Jones remained at Frazer's apartment. Shortly thereafter, McKibbon came back to Frazer's apartment and asked Jones to go back out with her. Jones reluctantly agreed.
McKibbon and Jones left the apartment building between 2:30 and 3:00 Sunday morning, July 9, 2000, and took a cab to the Yacht Club, a dance club in Clifton. After dancing inside the club for a while, the two came outside. The atmosphere outside the club was like a "festival," with people standing around socializing and playing music. Two of those people were Bubacarr "Bob" Kassama and his friend Dodou Cham.
Kassama and Cham, who were from Gambia, were enrolled as students at the University of Cincinnati. That night, both Kassama and Cham, who spoke with accents, were well dressed. Kassama wore an imitation Rolex watch and a big diamond and gold necklace. Cham wore a big silver chain and an imitation Rolex watch.
Once she was outside the club, McKibbon approached Kassama and Cham and said, "Damn, you guys have a Rolex and diamond watches and a necklace. Damn. What's up?" McKibbon then grabbed Cham's hand and looked at his wrist. She then looked at Kassama and repeated what she had said: "Damn, you got a diamond watch and necklace." McKibbon then introduced Jones, who had been talking with a neighborhood friend. Jones recognized Kassama from a previous encounter in a park. McKibbon and Jones told the two men that they were sisters and that they were both named "Nena."
After talking to Kassama and Cham for an hour, McKibbon asked the two if they would like to "hook up." Although Cham had misgivings about the idea, Kassama agreed. McKibbon then said, "Okay. Hold on. Let me call my mom." She walked about fifty feet away to a group of young men outside the club. After speaking to these men, she returned to where Kassama and Cham were standing and told them that she had talked to her mother. According to Jones, McKibbon had received a call on her cellular phone before leaving with Kassama and Cham.
The four of them then got into Kassama's car. Cham sat in the backseat with McKibbon, while Jones sat up front with Kassama. Cham testified that Kassama was driving towards his home when McKibbon said, "Oh, I think I saw my brother over there. I haven't seen my brother for so long. Can you just turn around and go to the club again and let me talk to my brother?" Kassama agreed and drove back to the Yacht Club. McKibbon left the car and walked to the same group of men to whom she had talked earlier. After talking with the group for about five minutes, McKibbon got back into Kassama's car.
While in the car, McKibbon got another call on her cellular phone. When Kassama proceeded onto Colerain Avenue, McKibbon told him, "My momma is tripping. She wants some money for babysitting. I have to go give her five or ten dollars and then we can come back." Kassama turned the car around and began following McKibbon's directions to her home in Bond Hill. McKibbon continued talking on her cellular phone.
When the four reached Fulton Avenue, where McKibbon lived, McKibbon instructed Kassama to park his car behind a truck that was two or three buildings up the street from McKibbon's apartment building. After Kassama had parked the car, McKibbon asked Cham if he and Kassama were drug dealers and if they were carrying guns. When Cham replied, "No," McKibbon said, "Let me call my mom to come downstairs." She then left the car and made a phone call.
McKibbon then walked further up the street and talked on the phone for fifteen to twenty minutes. During this time, she pointed to an apartment building up the street and said, "My mom is going to be here in a minute." She later returned, saying, "My momma has tricked me." She then pointed to another building about three blocks from the one where she had initially stated her mother was, and she said, "My momma went to my friend's house. That's where my momma is coming from."
At this point, Cham began talking with Kassama in their native language. He pleaded with Kassama to leave. He reminded him of the soccer game that they were scheduled to play later that day. Cham then told McKibbon that he and Kassama needed to leave. McKibbon replied, "Okay. My momma is going to be here in a little bit."
About that time, a taxi with one passenger drove near where Kassama's car was parked. It slowed down, so its occupants could look at Kassama and Cham. When Cham exclaimed, "Damn, what the hell these guys looking at?" McKibbon replied, "Are you scared? It's just a taxicab. Why are you scared?" The cab drove up between the two apartment buildings and let its passenger out. Around fifteen to twenty minutes later, the same cab returned and dropped off another passenger at the same spot between the two apartment buildings.
Cham told Kassama that he would walk home if Kassama did not want to leave, and Kassama agreed to leave. Just as Kassama began to pull away, McKibbon and Jones told Kassama that they could go to a party at a friend's apartment. Kassama then turned his car around and parked in the space he had just left. McKibbon then led the group to an apartment building on Fulton Avenue about three buildings from her own apartment building. By the time Kassama and Cham reached this apartment building, McKibbon was already inside.
Jones led the two men past a side door to the back of the building. They walked down some steps into the basement of the building. It was dark in the basement. Jones then led Kassama and Cham up another set of steps into a hallway. When Cham heard someone trying to open a door at the top of the steps, Jones told him it was just McKibbon trying to open an upstairs door. While Jones, Kassama and Cham stood in the hallway, Cham exclaimed, "Damn. It's still dark in here. Open the door." Jones then pushed open a side door, which turned out to be the same door that they had walked past on their way to the back of the building. When Cham asked Jones why they did not initially enter the building through the side door, Jones told him that the door must have been locked.
Cham testified that he felt uncomfortable as he stepped out the side door. Kassama was standing in the doorway. Jones testified that while she was standing just inside the doorway, McKibbon approached her and said, "They going to get them." Then, out of nowhere, a man approached and pointed a gun at Kassama and Cham. At the same time, Jones turned around to step out the door. She saw the gunman right in front of her. She recognized the gunman as Demetric Reynolds, whom she had met through Cole, McKibbon's boyfriend. Reynolds then yelled at Kassama and Cham, "Mother fuckers, take out your chains" and simultaneously pulled the trigger. Cham, who had been robbed before, described the incident as follows:
 He said, "Mother fuckers," he didn't even wait to say, "Take off your chain" and "give me your wallet." He didn't. Not this guy. He came to kill. The first time we got robbed, those guys came with the gun and said, "Give me your wallet, mother fucker." But this guy, they came to kill.
 The first shot went into Kassama's chest, killing him. Jones heard the bullet pass her ear and ran in fear for her life. As she reached the street, she saw Cole sitting in a car in front of McKibbon's apartment building.
Cham saw Kassama fall to the ground and ran. Reynolds shot at Cham as he ran, but the bullet missed, hitting the side door. Cham ran around the building and climbed a barbed-wire fence. As he went over the fence, he heard McKibbon scream loudly, "Don't let him go. Don't let the mother fucker go. Don't let him get away. This is the only witness." Cham kept running until he saw a police officer, whom he stopped for help. He took the police officer back to the scene of the shooting. By this time it was nearly 6:00 Sunday morning. There were police on the scene when they arrived. Missing from Kassama's neck was his gold and diamond necklace. His wallet was also missing.
Frazer testified that when she went to work that Sunday afternoon around 1:30, McKibbon's children were still with a nephew who had been babysitting. Frazer, whom McKibbon called "Momma," denied babysitting McKibbon's children earlier that morning. She also denied calling McKibbon on her cellular phone or receiving any phone calls from her that morning. Moreover, she testified that McKibbon's biological mother lived in Indiana.
Frazer further testified that she did not see McKibbon again until after 10:00 Sunday evening, when McKibbon came to her apartment several times. McKibbon used the phone in Frazer's apartment during one of those visits because she did not have a phone in her apartment. McKibbon also asked Frazer if she had heard anything about a shooting.
On McKibbon's third visit to Frazer's apartment, she told Frazer that she and Jones were present when Kassama was shot, that Cole had snatched the chain off Kassama's neck, and that Reynolds had done the shooting. Later that night, McKibbon left her apartment with Jones and her four children. On her way out, McKibbon told Frazer that she planned to cut her hair very short and dye it blond in the style of a rap singer, as a disguise. Frazer never saw McKibbon again.
When Cham met with the police, he gave them a piece of paper that had the name "Nena" and a phone number written on it. The police traced the number to a disconnected phone in McKibbon's name. When the police could not locate McKibbon at her apartment on Fulton Avenue, they executed a search warrant. A police officer testified that her apartment was "pretty disheveled" and appeared to have been ransacked. There were items lying all over the floor and furniture was turned over. It looked as though people had left in a hurry. Photographs of McKibbon that had been hanging on the walls had been removed. Police found Reynolds's social-security card in McKibbon's apartment, as well as a camera. The police developed the film in the camera and showed it to Cham. He identified both Jones and McKibbon in the photographs. Nearly a month later, police arrested McKibbon, who had been staying with Cole at a motel in Cincinnati.
During the trial, the state's case against McKibbon centered on the testimony of Cham, Jones, Frazer, and McKibbon's downstairs neighbor, Tiffaney Huchinson. Huchinson testified that McKibbon had approached her a few months prior to July 8, 2000, and asked her if "she wanted to go to a club and get some guys for their money." After the state rested its case, the defense did not call any witnesses to testify.
 II. ANALYSIS
In her first assignment of error, McKibbon contends that the trial court's instruction to the jury on flight, over defense counsel's objection, unfairly shifted the burden of proof to her, as the defendant, to explain her motive for the flight. McKibbon relies on our decision in State v. Fields[1] to support her argument.
A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.[2] In determining whether a jury instruction constitutes prejudicial error, an appellate court must determine, from the record, whether such instruction may have resulted in a manifest miscarriage of justice.[3] When a specific instruction is challenged on appeal, the instruction should not be judged in isolation; rather, it must be viewed in the context of the overall charge.[4]
The Ohio Supreme Court has held that a criminal defendant's flight from justice may be indicative of a consciousness of guilt.[5] Ohio appellate courts have held that trial courts must be extremely cautious when giving a flight instruction to avoid either an express statement that a defendant must satisfactorily explain his flight in order to avoid a "consciousness of guilt" finding or an inference that a defendant's choice not to testify at trial in order to rebut the "consciousness of guilt" somehow proves his guilt.[6] In State v. Fields, for example, this court held that the trial court's inclusion of the phrase "unless satisfactorily explained" in a flight instruction was unconstitutional because it wrongfully placed a burden upon the defendant and violated the defendant's right to remain silent under the Fifth andFourteenth Amendments to the United States Constitution.
As part of the instruction on flight at McKibbon's trial, the court stated to the jury,
 But it will become important, if you find that the defendant did flee, to ascertain from the evidence the motive that prompted that flight. If her flight was prompted by a consciousness of guilt of the charge contained in the indictment, then this is a circumstance from which, together with the other circumstances, her guilt may be inferred.
 In determining the motive which prompted the Defendant's flight, you will take into consideration all the facts and circumstances as disclosed by the evidence. If you find beyond a reasonable doubt that consciousness of her guilt of the charges contained in the indictment prompted the flight, you will give to it the proper consideration. On the other hand, if some other motive prompted the flight, you will give the flight no further consideration in connection with the guilt or innocence of the defendant. In other words, in that event you will immediately dismiss the question of flight or any inference therefrom.
 Having reviewed the record, we cannot conclude that the trial court's instruction resulted in a manifest miscarriage of justice. In this case, the flight instruction read by the trial court informed the jury that it had to determine McKibbon's motivation from the evidence before it. The court further instructed the jury that it should take into consideration only
those facts and circumstances disclosed by the evidence. The trial court also stated to the jury at several points that the state bore the burden of proving McKibbon's guilt beyond a reasonable doubt.[7]
Moreover, our review of the evidence reveals that the evidence against McKibbon was so overwhelming that the jury would have returned a guilty verdict even if the flight instruction had not been given. We, therefore, overrule the first assignment of error.
In her second assignment of error, McKibbon challenges her conviction for aggravated murder on both the sufficiency and the weight of the evidence. She contends that there was insufficient evidence before the jury to support its finding that she purposely aided and abetted Kassama's murder and that she possessed the requisite intent to kill. We disagree.
A reviewing court may not reverse a jury verdict for insufficient evidence, when, with the evidence viewed in a light most favorable to the state, there is substantial evidence upon which the jury could have concluded that all of the elements of the charged offenses had been proved beyond a reasonable doubt.[8] To reverse a conviction on the manifest weight of the evidence, a reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice.[9] A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction.[10]
The complicity statute, R.C. 2923.03, in relevant part states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * *[a]id or abet another in committing the offense." R.C. 2903.01(B), the aggravated-murder statute, states that "[n]o person shall purposely cause the death of another* * *while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit* * *aggravated robbery* * *." The Ohio Supreme Court has held that "a jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design andeither the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony, or the felony and the manner of its accomplishment would be reasonably likely to produce death."[11]
There is ample evidence in the record that McKibbon actively participated in the planning of a robbery, and that during the actual robbery Kassama was killed. The state also presented evidence showing that McKibbon knew that a gun was to be employed to accomplish the robbery and that the robbery was reasonably likely to produce Kassama's death. McKibbon had asked Cham and Kassama if they were drug dealers and if they were carrying guns. She then led Cham and Kassama to a dark building and left them alone with Jones. Prior to the shooting, she told Jones, "They're going to get them now." Reynolds then appeared with a gun and demanded the two men's jewelry. The jury could have inferred from this evidence that McKibbon knew a weapon was going to be employed in the robbery and did not want to be in the line of fire.
Furthermore, Cham testified that while Kassama was shot and lay dying on the ground and he was running for his life, McKibbon screamed, "Don't let him go.
Don't let the mother fucker go. Don't let him get away." The jury could have inferred from this testimony that McKibbon wanted Reynolds to shoot and kill Cham just like he had shot and killed Kassama. Thus, upon viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence to find that McKibbon had aided and abetted Reynolds and Cole in Kassama's murder, which was committed during an aggravated robbery. We further hold that the jury did not lose its way in finding McKibbon guilty. As a result, we overrule the second assignment of error.
In her third assignment of error, McKibbon argues that the trial court gave a deficient instruction on complicity. She contends that the trial court failed to make clear that complicity in an offense requires the specific mental state for that offense. Thus, she argues that the instruction given may have allowed the jury to find her guilty of complicity, and therefore of aggravated murder, without a finding that she had specifically intended to kill Kassama. She also argues that the prosecutor erroneously stated the law on complicity during closing argument, which compounded the trial court's ambiguous instruction. We disagree.
Our review of the record reveals that defense counsel did not object to the complicity instruction given at trial. Thus, McKibbon's argument must be reviewed under the plain-error standard. Plain error exists only when it is clear that the verdict would have been otherwise, but for the alleged error.[12]
In this case, the trial court specifically instructed the jury that McKibbon could be convicted of aggravated murder only if the state proved beyond a reasonable doubt that she intended to kill Kassama. The trial court also explained to the jury how it could determine if McKibbon had acted purposely or knowingly, thus underlining that her intent was necessary to sustain a conviction. As a result, we conclude that the possibility of any jury confusion did not reach the level of plain error.
Nor can we conclude that the prosecutor's statements during closing argument rose to the level of plain error. The record reveals that the trial court instructed the jury, on more than one occasion, that opening and closing arguments were not to be considered as evidence. The trial court also instructed the jury, that it, not the parties, would provide the appropriate instructions on the law. As a result, we overrule the third assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Gorman, P.J., and Painter, J. concur.
[1] (1973), 35 Ohio App.2d 140, 145, 300 N.E.2d 207, 210-211.
[2] See State v. Adams (1980), 62 Ohio St.2d 151, 154, 404 N.E.2d 144,146.
[3] See id.
[4] See State v. Price (1979), 60 Ohio St.2d 136, 398 N.E.2d 772, paragraph four of the syllabus.
[5] See State v. Taylor (1997), 78 Ohio St.3d 15, 27, 676 N.E.2d 82,94.
[6] See, e.g., Fields, supra; State v. Williams (Dec. 17, 1992), Cuyahoga App. No. 61262, unreported.
[7] See State v. Jones (2001), 91 Ohio St.3d 335, 349,744 N.E.2d 1163, 1179.
[8] See State v. Waddy (1992), 63 Ohio St.3d 424, 588 N.E.2d 819.
[9] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, 547, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720.
[10] State v. Thompkins, supra, at 387, 678 N.E.2d at 546-547.
[11] See State v. Scott (1980), 61 Ohio St.2d 155, 165,400 N.E.2d 375, 382, citing State v. Lockett (1976), 49 Ohio St.2d 48,358 N.E.2d 1062, paragraphs three and four of the syllabus.
[12] See State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804.