[Cite as *State v. Thomas*, 2015-Ohio-4932.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2015CA00037 |
| JAPHETH JAVON THOMAS | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Criminal appeal from the Stark County Court of Common Pleas, Case No. 2013CR1880(B)

JUDGMENT:      Affirmed in part; reversed in part and remanded

DATE OF JUDGMENT ENTRY:      November 23, 2015

APPEARANCES:

For: Plaintiff-Appellee

JOHN D. FERRERO
Stark County Prosecutor
BY: KATHLEEN TATARSKY
110 Central Plaza South
Canton, OH 44702

For: Defendant-Appellant

KELLY MURRAY
810 Courtyard Centre
116 Cleveland Avenue N.W.
Canton, OH 44702

*Gwin, P.J.*

**{¶1}** Appellant Japheth Javon Thomas ["Thomas"] appeals his convictions and sentences after jury trial in the Stark County Court of Common Pleas on one count of aggravated murder, R.C. 2903.01(B) with firearm specification, RC 2941.145, one count of aggravated robbery, R.C. 2911.01(A)(1) and or (A)(3), with a firearm specification R.C. 2941.145, one count of aggravated burglary, R.C. 2911.11(A)(1) and/or (A)(2) with a firearm specification R.C. 2941.145, three counts of aggravated burglary, R.C.2911.11(A)(2), one count of burglary, R.C.2911.12(A)(3) and one count of grand theft of a motor vehicle, R.C. 2913.02(A)(1)(b)(5).

*Facts and Procedural History*

**{¶2}** The charges in the case at bar arose from the home invasion aggravated burglary of Kim Eller on November 22, 2013, the home invasion aggravated burglary of Eugene Render on November 18, 2013, and the subsequent home invasion robbery and killing of Eugene Render on November 22, 2013.

**NOVEMBER 18, 2013 - CANTON**

**{¶3}** David Render testified that Eugene Render was his father. David Render stated that his father called him on November 18, 2013 to let him know that someone had tried to break in to his residence. The Canton police were called and Officer Michael Roberts responded and learned from Mr. Render that he heard a loud crash and someone kicking in his door. He yelled out and the intruders ran away.

**{¶4}** Roberts looked around the home and looked at the door. The doorframe had been splintered and pieces were lying on the floor. He made a police report.

{¶5} David Render stated that he did see damage to his father's home where the breezeway door was broken. David Render wanted his father to come stay with him. However, Mr. Render refused instead boarding up his door with two by fours.

### NOVEMBER 21, 2013 - WHITE NISSAN IS STOLEN

{¶6} Thomas lived with the Bonnell family for a time and was familiar with their home on 23rd Street in Canton. On November 21, 2013, around midnight, two men broke into the home; one was wearing a zip-up hoodie with a skull face and the other was wearing a bandana with a hoodie. Tana Bonnell recognized one of the men as Thomas. Thomas went into her mother's bedroom, grabbed her purse from the dresser and ran outside. They took her mother's white Nissan crossover used in the subsequent robberies and killing of Mr. Render.

### NOVEMBER 22, 2013 - NAVARRE

{¶7} Kim Eller testified that she lives at 266 Bender St. NE., Lot Number 5, Navarre, Ohio. On November 22, 2013, two masked black men entered her bedroom with guns. The short one held a gun to her head and told her not to move and to shut up. The tall, thin one with a big nose rifled through her home. They left taking her laptop computer.

{¶8} Sgt. Chris Hummel of the Navarre Police Department testified that he was on duty November 22, 2013 and he responded to a burglary call at 266 Bender Street. Sgt. Hummel testified that he observed the door had been broken in for that residence. Eller was shook up but was able to give Hummel a statement.

**NOVEMBER 22, 2013 - CANTON**

{¶9} David Render testified that he and his wife went to his father's residence on November 22, 2013 after his father had repeatedly not answered phone calls. Upon arriving, he observed the outside door was busted up, glass was knocked out of the screen door, and a door handle was bent. David Render then went into his father's residence where he found a camouflage gun laying on the floor and then ultimately found his father dead on the floor. David Render also observed a Glock on the kitchen table that had its slide closed and the clip was still in it.

{¶10} Three Canton City police patrol cars were dispatched to the home of Mr. Render on Montrose Avenue; Officer Joseph Bays was one of them. Bays went into the house and saw a rifle lying on the breezeway floor, a 9-millimeter Glock pistol on the kitchen table and a body lying on the kitchen floor. One of the medics had cleared the Glock. Officer Bays was instructed by Sgt. George to stand by a hat or a bandanna that was found north of the residence until someone came to collect it.

{¶11} Detective Victor George and agents from the Bureau of Criminal Investigation were called. There was definite evidence that Mr. Render as well as the home invaders fired a weapon.

{¶12} The body of Mr. Render was removed by the medics and taken to the hospital. He was pronounced dead at 6:55 pm. Dr. P.S.S. Murthy, the Stark County Coroner, performed an autopsy the next day. In an external examination, Murthy noted two gunshot wounds, one in the right chest and one in the right lower quadrant of his abdomen. The gunshot wound to the chest had an oval appearance and entered the

body at a right angle. It perforated the lower lobe of the right lung causing an accumulation of blood and was fatal.

{¶13} The gunshot wound to the abdomen had a different appearance; it scraped the body before it entered. It appeared that Mr. Render was in a crouched position when that bullet entered his body. It entered the right lobe of the liver causing massive damage; it pulpified the liver and was fatal. Dr. Murthy found no stippling or soot meaning that the gun was not shot at close range.

{¶14} Dr. Murthy extracted two large caliber hollow point bullets from Mr. Render's body. They were turned over to Larry Hootman, a crime scene agent with the Attorney General's Bureau of Criminal Investigation.

{¶15} Michael Roberts, a firearms expert with BCI examined the bullet recovered from the body of Mr. Render and the cartridges from the scene. Roberts determined they were Remington brand .40-caliber hollow point bullets meant to cause more damage than full metal jacket bullets. They were all fired from the same firearm. The firearm was not recovered at the scene. However, Roberts opined that they were fired from an operable Smith and Wesson Sigma Series pistol.

{¶16} Jennifer LaCava, a forensic scientist with BCI, tested the blue bandana and hat recovered outside at the scene for DNA. Thomas' DNA was found on the hat and the bandana.

## THOMAS IS SHOT AND GOES TO TIMKEN MERCY

{¶17} On Friday, November 22, 2013 about 9:00 pm, then Detective Robert Redleski responded to a "shooting casualty" call from Timken Mercy Medical Center. There, Redleski met Thomas. Thomas told him he was shot in the left arm at Chips

Apartments and gave him two names and phone numbers who could verify the account. Redleski went back to the police station to follow up and learned that Thomas was a suspect in the theft of a white Nissan crossover.

{¶18} The next day, Detective Redleski was asked to respond to a "homicide" on Montrose Avenue. He noted the blood on the outside door that indicated that one of the assailants might have been injured.

**THOMAS IS ARRESTED WITH THE WHITE NISSAN AND THE STOLEN LAPTOP**

{¶19} A warrant was secured for the arrest of Thomas and the United States Marshal's Task Force (Task Force) found him driving the Bonnell's stolen Nissan. Thomas was arrested. A laptop computer was found in the Nissan. The laptop computer found in the white Nissan when Thomas was arrested was identified by Eller as the stolen computer.

{¶20} The police returned to Thomas' residence where they conducted a search and brought several persons down to police headquarters for interviews.

**THOMAS IS INTERVIEWED BY DETECTIVE GEORGE**

{¶21} After waiving his *Miranda* rights, Thomas spoke to George. (3T. at 555). Thomas also testified during his jury trial.

{¶22} At trial, Thomas admitted to participating in all three burglaries and the theft of the Bonnell's vehicle.

{¶23} Thomas testified that he had used a BB gun in the initial attempt to enter Mr. Render's home and at the trailer in Navarre; however, he stated he left the gun outside when he entered the Bonnell residence.

{¶24} On November 22, 2013, Thomas took an unloaded rifle to Render's home. Mikal Johnson[1] had a gun. Thomas testified at trial,

> ...I didn't really know him to carry guns at all, I didn't expect him to. When we got there at the door, I'm actually we were about to break in, I saw him pull it out of his pocket, and it startled me I realized, okay. He has a real gun.

3T. at 547. Thomas made Johnson go in first because he had the real gun. (3T. at 565).

{¶25} A juror asked Johnson a question: "Why didn't you leave when you found out the gun was real that Mikal [Johnson] had?" Thomas responded, "I don't know." (3T. at 571).

{¶26} Thomas heard Johnson shoot four or five times. Thomas then ran to get the car and waited for Johnson. Thomas and Johnson went back to the house.

{¶27} At the close of the trial, Thomas requested a jury instruction on the lesser offenses of murder and manslaughter. The trial court allowed the instruction on murder but declined give an instruction for manslaughter.

{¶28} After hearing the evidence and receiving instructions from the trial court, the jury returned with verdicts of guilty to aggravated murder (with a firearm specification), aggravated robbery (with a firearm specification), aggravated burglary (with a firearm specification), three counts of aggravated burglary [R.C. 2911.11(A)(2)], burglary and grand theft of a motor vehicle.

{¶29} At the Sentencing hearing held on January 23, 2015, Thomas was sentenced to thirty years to life for aggravated murder with a consecutive three years for the related firearm specification. The aggravated robbery and aggravated burglary

---

[1] *See, State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015-Ohio-3113.

counts together with their related firearm specifications were merged with Count one. Additionally Thomas received consecutive sentences of eleven (11) years for each of the three aggravated burglary counts. The one count of grand theft of a motor vehicle was merged with the related aggravated burglary count. In total, Thomas received a sentence of sixty-nine years to life with the possibility of parole only after serving sixty-nine years.

*Assignments of Error*

{¶30} Thomas raises three assignments of error,

{¶31} "I. THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY ON THE LESSER OFFENSE OF INVOLUNTARY MANSLAUGHTER AS REQUESTED BY APPELLANT.

{¶32} "II. APPELLANT'S CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶33} "III. APPELLANT'S CONVICTION FOR AGGRAVATED ROBBERY AS SET FORTH IN COUNT FIVE OF THE INDICTMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE."

I.

{¶34} Thomas was charged with aggravated murder in violation of R.C. 2903.01(B) [felony murder] with a firearm specification. The underlying felonies were aggravated robbery and aggravated burglary.

{¶35} We review a trial court's refusal to provide a requested jury instruction for an abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). Generally, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh evidence and discharge its duty as the fact finder." *State v. Comen,* 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

{¶36} "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to defendant. *State v. Smith*, 89 Ohio St.3d 323, 331, 731 N.E.2d 645(2000); *State v. Wilkins*, 64 Ohio St.2d 382, 388, 415 N.E.2d 303(1980).

{¶37} Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser-included offense. There must be "sufficient evidence" to "allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense." *State v. Shane*, 63 Ohio St.3d at 632-633, 590

N.E.2d 272; *State v. Conway*, 108 Ohio St.3d at 240,842 N.E.2d at 1027, 2006-Ohio-791 at ¶ 134.

**{¶38}** The Ohio Supreme Court has cautioned,

Past decisions of this court have sometimes given the erroneous impression that, whenever there is "some evidence" that a defendant in a murder prosecution may have acted in such a way as to satisfy the requirements of the voluntary manslaughter statute, an instruction on the inferior-degree offense of voluntary manslaughter must always be given. See, *e.g., State v. Muscatello* (1978), 55 Ohio St.2d 201, 9 O.O.3d 148, 378 N.E.2d 738, paragraph four of the syllabus. See, also, *Tyler, supra,* 50 Ohio St.3d at 37, 553 N.E.2d at 592. That clearly never has been the law in this state, nor is it the law today. The "some evidence" referred to in those cases is simply an abbreviated way of saying that a jury instruction must be given on a lesser included (or inferior-degree) offense when sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense.

To require an instruction to be given to the jury every time "some evidence," however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense. Trial judges are frequently required to decide what lesser-included (or inferior-degree) offenses must go to the jury and which must not. The jury

would be unduly confused if it had to consider the option of guilty on a lesser included (or inferior-degree) offense when it could not reasonably return such a verdict.

*State v. Shane*, 63 Ohio St.3d at 632-633, 590 N.E.2d 272 (emphasis in original).

{¶39} The Ohio Supreme Court held in 1988 that involuntary manslaughter is a lesser-included offense of aggravated murder. *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), *paragraph one of the syllabus, cert. denied*, 493 U.S. 826(1989); *Accord, State v. Adams,* Ohio Sup. Ct. No. 2011-1978, 2015-Ohio-3954, 2015 WL 5728458(Oct. 1, 2015), ¶ 242. The difference between the two offenses is the mental state of the accused. Aggravated murder under R.C. 2903.01(B) requires a purpose to kill, while involuntary manslaughter requires only that the killing occur as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A); State v. *Thomas*, 40 Ohio St.3d 213, 216–217, 533 N.E.2d 286(1988).

{¶40} R.C. 2901.22 Culpable mental states, provides:

(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶41} Involuntary manslaughter, as relevant here, is defined in R.C. 2903.04(A),

No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

**{¶42}** Thomas freely admitted that he participated in the robbery and burglary of Mr. Render that resulted in his killing on November 22, 2013. He claims, however, that he did not know that Johnson had a loaded firearm, which he used in the killing. In short, he did not intend to kill Mr. Render. As a result, he claims entitlement to a jury instruction on the lesser-included offense of involuntary manslaughter.

**{¶43}** In *State v. Jester,* 32 Ohio St.3d 147, 152, 512 N.E.2d 962, 968(1987), the Ohio Supreme Court held:

Where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill. *State v. Clark* (1978), 55 Ohio St.2d 257, 9 O.O.3d 257, 379 N.E.2d 597, *syllabus; State v. Johnson* (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637.

*Accord, State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025(1982) (finding purpose to kill in passenger's firing gun at individual from moving vehicle); *State v. Dunlap*, 73 Ohio St.3d 308, 316, 652 N.E.2d 988(1995), *certiorari denied* (1996), 516 U.S. 1096, 116 S.Ct. 1096, 133 L.Ed.2d 765. *State v. Banks,* 10th Dist. No. 01 AP–1179, 2002–Ohio–3341 at ¶ 24.

The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death. *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus; *State v. Edwards* (1985), 26 Ohio App.3d 199, 200, 499 N.E.2d 352. Here,

defendant looked at a group of individuals, pointed a semi-automatic handgun in their direction, and fired five shots. In so doing, one of the bullets fired from the handgun struck and killed his driver, Andre J. Bender. Although defendant claims the evidence equally supports a conclusion that he was merely trying to scare individuals in the group by firing the handgun into the air, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Brown* (Feb. 29, 1996), Cuyahoga App. No. 68761, unreported. *Compare State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962 (when an inherently dangerous instrumentality is employed in the commission of a robbery, such evidence permits a jury to find a purposeful intent to kill).

*State v. Turner*, 10th Dist. No. 97APA05-709, 1997 WL 798770(Dec. 30, 1997), *quoting State v. Brown*, 8th Dist. No. 68761, 1996 WL 86627(Feb. 29, 1996) *dismissed, appeal not allowed*, 77 Ohio St.3d 1468, 673 N.E.2d 135.

**{¶44}** In the case at bar, Mikal Johnson was with Turner at the time Render was shot. The evidence indicates that both were involved in the crimes and were present on the night of the murder. Both had previously intended to break into the home and or rob Render on November 18, 2013. (3T. at 538). When asked by Detective George why the pair did not complete the robbery the first time and returned later, Thomas replied,

Um, cause the guy was in there. We only had the BB gun the first and we didn't know if he had a gun or not and he had one so we just took off and then had a real one.

{¶45} Johnson admitted that he saw the handgun Johnson was carrying before they broke the door of Mr. Render's residence:

[KOUKOUTAS] Did Mikal Johnson have a weapon on him?

[THOMAS] I found that out, yes.

[KOUKOUTAS] What kind of weapon did he have on him?

[THOMAS] He had a gun I later found out when we got there.

[KOUKOUTAS] What do you mean you found out when you got there?

[THOMAS] Me and him, I didn't really know him to carry guns at all.

I didn't expect him to. When we got there at the door, I'm actually we were about to break in, I saw him pull it out of his pocket, and it startled me I realized, okay. He has a real gun.

[KOUKOUTAS] Did you know it was loaded?

[THOMAS] No.

3T. at 547-548.

{¶46} Where a defendant enters into a common design with others to commit armed robbery by the use of force, violence, and a deadly weapon, and all the participants are aware that an inherently dangerous instrumentality is to be employed to accomplish the felonious purpose, a homicide which occurs during the commission of the felony is a natural and probable consequence of the common plan which is presumed to have been intended. *State v. Lockett*, 49 Ohio St.2d 48, 60-62, 358 N.E.2d 1062(1976), *rev'd on other grounds,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Evidence of such is sufficient to allow a jury to find a purposeful intent to kill on

the part of an aider and abettor. See *Lockett, supra*, 60-62; *Accord, State v. Jester*, 32 Ohio St.3d 147, 153, 512 N.E.2d 962(1987).

> Where only such unlawful act was contemplated in the original conspiracy, although not identical with or similar to the criminal act charged, if the conspired unlawful act and the manner of its performance would be reasonably likely to produce death, each conspirator is equally guilty with the principal offender, as an aider and abettor in the homicide, although such aider and abettor was neither present nor had knowledge of the physical killing or of the weapon used.

*State v. Doty*, 94 Ohio St. 258, 113 N.E. 811(1916), syllabus at para. 2.

**{¶47}** In the case at bar, Thomas admitted that he assisted in the planning and preparation for the home invasion. He further testified that he knew Johnson had a real gun before he entered Render's home on November 23, 2013. Thomas further testified that in spite of this knowledge, he followed Johnson into the home. After the shooting, Thomas retrieved the car and waited for Johnson before fleeing the scene.

> As stated in the opinion in *Goins v. State,* 46 Ohio St. 457, 21 N.E. 476, there are many authorities which attach equal criminal responsibility if the killing was done in advancing the unlawful common design.

> This feature of the criminal law is founded upon the basic principle that persons engaged in an unlawful enterprise are presumed to acquiesce in whatever may be reasonably necessary to accomplish the object of the conspiracy; and if, under the circumstances, if might be reasonably expected that life might be endangered by the manner or

means of performing the unlawful criminal act conspired, each is bound by the consequences naturally or probably arising in its furtherance, and in case of death would be guilty of homicide.

*State v. Doty,* supra at 264, 113 N.E. at 813; *State v. Black*, 103 Ohio St. 434, 441, 133 N.E. 795, 797(1921).

**{¶48}** We find the evidence could not have permitted a reasonable jury to find that Thomas aided and abetted in the killing of Mr. Render as a proximate result of committing a felony but without specifically intending to cause Mr. Render's death.

**{¶49}** Accordingly, the trial court did not err in refusing to instruct the jury on the lesser offense of involuntary manslaughter.

**{¶50}** Thomas' first assignment of error is overruled.

II.

**{¶51}** In his second assignment of error, Johnson challenges the sufficiency of the evidence for his conviction for aggravated murder; he further contends his conviction for aggravated murder is against the manifest weight of the evidence produced by the state at trial.

**{¶52}** Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d

1239, 2010–Ohio–1017, ¶146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶68.

**{¶53}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, *quoting* Black's Law Dictionary (6th Ed. 1990) at 1594.

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 387, 678 N.E.2d 541, *quoting Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–

721 (1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶54}** Thomas was convicted of aggravated murder under R.C. 2903.01(B), which provides that "[n]o person shall purposely cause the death of another... while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit ... aggravated robbery and/or aggravated burglary."

**{¶55}** R.C. 2901.22 Culpable mental states, provides:

(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender

intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

**{¶56}** In *State v. Jester,* 32 Ohio St.3d 147, 152, 512 N.E.2d 962, 968(1987), the Ohio Supreme Court held:

> Where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill. *State v. Clark* (1978), 55 Ohio St.2d 257, 9 O.O.3d 257, 379 N.E.2d 597, *syllabus; State v. Johnson* (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637.

*Accord, State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025(1982) (finding purpose to kill in passenger's firing gun at individual from moving vehicle); *State v. Dunlap*, 73 Ohio St.3d 308, 316, 652 N.E.2d 988(1995), *certiorari denied* (1996), 516 U.S. 1096, 116 S.Ct. 1096, 133 L.Ed.2d 765. *State v. Banks,* 10th Dist. No. 01 AP–1179, 2002–Ohio–3341 at ¶ 24.

> The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death. *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus; *State v. Edwards* (1985), 26 Ohio App.3d 199, 200, 499 N.E.2d 352. Here, defendant looked at a group of individuals, pointed a semi-automatic handgun in their direction, and fired five shots. In so doing, one of the bullets fired from the handgun struck and killed his driver, Andre J.

Bender. Although defendant claims the evidence equally supports a conclusion that he was merely trying to scare individuals in the group by firing the handgun into the air, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Brown* (Feb. 29, 1996), Cuyahoga App. No. 68761, unreported. *Compare State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962 (when an inherently dangerous instrumentality is employed in the commission of a robbery, such evidence permits a jury to find a purposeful intent to kill).

*State v. Turner*, 10th Dist. No. 97APA05-709, 1997 WL 798770(Dec. 30, 1997), *quoting State v. Brown*, 8th Dist. No. 68761, 1996 WL 86627(Feb. 29, 1996) *dismissed, appeal not allowed*, 77 Ohio St.3d 1468, 673 N.E.2d 135.

{¶57} In the case at bar, Thomas was not an innocent bystander who was merely along for the ride. As noted in our disposition of Thomas' first assignment of error, Thomas admitted that he assisted in the planning and preparation for the home invasion. He further testified that knew Johnson had a real gun before he entered Render's home on November 23, 2013. Thomas further testified that in spite of this knowledge, he followed Johnson into the home. After the shooting, Thomas retrieved the car and waited for Johnson before fleeing the scene.

{¶58} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that

Thomas had aided and abetted in committing the crimes of aggravated murder, aggravated robbery and aggravated burglary.[2]

{¶59} We hold, therefore, that the state met its burden of production regarding each element of the crime of aggravated murder and, accordingly, there was sufficient evidence to support appellant's conviction for aggravated murder.

{¶60} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, *citing State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

---

[2] We note that Thomas has not challenged any of his other convictions for the actions that had occurred on November 22, 2013 or November 23, 2013.

**{¶61}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

**{¶62}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

**{¶63}** Although Thomas testified that he did not know Johnson was going to bring a real handgun with him to Render's home on November 23, 2013, and further he did not know whether or not the gun was loaded, the jury was free to accept or reject any and all of the evidence offered by Thomas and the state and assess the witness's credibility. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492(1991). "While the jury may take note of the

inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks, supra.*

{¶64} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting Thomas of the charges.

{¶65} Based upon the foregoing and the entire record in this matter, we find Thomas' conviction for aggravated murder is not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and Thomas. This court will not disturb the jury's finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of Thomas' guilt.

{¶66} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime of aggravated murder beyond a reasonable doubt.

{¶67} Thomas' second assignment of error is overruled.

III.

{¶68} In his third assignment of error, Thomas attacks his conviction and sentence on Count Five of the indictment, the aggravated burglary with a deadly weapon or dangerous ordnance of Eugene Render on November 18, 2013.

{¶69} Thomas was convicted of aggravated burglary under R.C. 2911.11. That statute provides,

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶70} R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." The Ohio Supreme Court has

recently addressed the meaning of "deadly weapon." *In re J.T.,* Ohio Sup. Ct. No. 2014-0449, 2015-Ohio-3654, 2015 WL 5255271(Sept. 10, 2015).

In *J.T.,* a juvenile was carrying a broken pistol in his waistband that was no longer capable of firing a round. He was convicted of carrying a concealed weapon in violation of R.C. 2923.12(A),

> (A) No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following:
>
> > (1) A deadly weapon other than a handgun;
> >
> > (2) A handgun other than dangerous ordnance;
> >
> > (3) A dangerous ordnance.

**{¶71}** In reversing the juvenile's conviction, the Supreme Court observed,

> Today, we apply a common-sense reality check to that fact pattern. When a person has an inoperable handgun tucked into his or her waistband and does not use it as a bludgeoning implement, it is not a deadly weapon. While it had been designed as a deadly weapon in that it was meant to fire a potentially lethal projectile, its essence as a deadly weapon ended when it became inoperable. In effect, since it was inoperable, it was no different from a stone or a brick. If it had been used as a bludgeon or otherwise used, possessed, or carried as a weapon, it could be considered a deadly weapon. As nothing more than a heavy object tucked into a waistband or a pocket, however, it was not. Just as it would be improper to convict someone of carrying a concealed weapon simply because he had a stone in his pocket, it is also improper to convict

someone of that crime simply for having an inoperable pistol tucked into his waistband.

*J.T.* at ¶1. The Supreme Court further noted,

This court has previously held that a pistol must be operable or readily rendered operable at the time of the offense in order to be a "firearm" that would support a firearm specification under former R.C. 2929.71, Am.Sub.H.B. No. 261, 142 Ohio Laws, Part II, 3109. *State v. Murphy*, 49 Ohio St.3d 206, 208, 551 N.E.2d 932 (1990), *citing State v. Gaines,* 46 Ohio St.3d 65, 545 N.E.2d 68 (1989), syllabus. While the present case does not involve a firearm specification, there is no valid basis to distinguish between guns for purposes of a firearm specification and for the statute prohibiting carrying a concealed weapon. To allow an inoperable handgun to be considered a per se deadly weapon would be an unintended expansion of the statute. The General Assembly has shown that it is capable of crafting a statute that penalizes someone for carrying a gun whether it is operable or inoperable. R.C. 2923.122(C), the statute prohibiting weapons within a school zone, states, "No person shall knowingly possess an object in a school safety zone if * * * [t]he object is indistinguishable from a firearm, whether or not the object is capable of being fired."

*J.T.* at ¶7.

{¶72} In the case at bar, the term "deadly weapon" is the same as the term analyzed by the Supreme Court in *J.T.* There is no dispute in the case at bar; a B.B.

gun is not a "firearm" as defined by R.C. 2923.11(B) or a "handgun" as defined by R.C. 2923.11(C). In the case at bar, the state argues as was argued In *J.T.* , " And the arresting police officer testified that the pistol was a heavy, blunt object—evidence that the pistol was capable of inflicting deadly harm." *J.T.* at ¶4; State's Brief at 28-29.

**{¶73}** The evidence in the case at bar establishes that during the November 18, 2013 incident, Render "yelled out and the intruders ran away." State's Brief at 10. Thomas testified during his jury trial,

> And we yanked the door open, the breezeway door, and I kicked in the next door and Mike [Johnson] went in first. And when he got inside around the corner, he said he saw someone standing there, and he ran back the other way and we just left the residence.

3T. at 538.

**{¶74}** In the case at bar, there is no evidence that Render ever saw the B.B. guns in Thomas and Johnson's possession. Thomas did not attempt to bludgeon Render.  There is no evidence that Thomas brandished, or pointed the B.B. gun at Render in an attempt to coerce Render into compliance with the demands of the pair. Rather, Thomas fled the scene when it became apparent Render was in the home. Accordingly, there is no evidence in the case at bar that Thomas used as a bludgeon or otherwise used, possessed, or carried the B.B. gun as a weapon.

**{¶75}** Based on the foregoing analysis, we conclude that there is insufficient evidence to establish the use of a "deadly weapon," an essential element for the offense of aggravated burglary in connection with the aggravated burglary of the Render residence in Canton, Ohio on November 18, 2013.

**{¶76}** Thomas's third assignment of error is sustained.

*Conclusion*

**{¶77}** The judgment of the Stark County Court of Common Pleas is affirmed, in part and reversed, in part. Thomas' conviction and sentence on Aggravated Burglary of the home of Eugene Render, 316 Montrose Avenue, NW, Canton, Ohio on November 18, 2013 as set forth in Count Five of the Indictment filed January 28, 2014 is reversed and this case is remanded to the trial court for proceedings in accordance with our opinion and the law. This decision in no way affects the guilty verdicts and sentences issued by the jury on any other count of the indictment. It only affects the entry of conviction and sentence on Count Five of the Indictment. The decision of the Stark County Court of Common Pleas is affirmed in all other respects.

By Gwin, P.J.,
Hoffman, J., and
Wise, J., concur