[Cite as *State v. Womack*, 2021-Ohio-1309.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2020CA00096 |
| | : | |
| KEVIN J. WOMACK | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:        Appeal from the Stark County Court of
                                Common Pleas, Case No. 2019CR0614


JUDGMENT:                       AFFIRMED



DATE OF JUDGMENT ENTRY:         April 14, 2021



APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

KYLE L. STONE                              BERNARD L. HUNT
STARK COUNTY PROSECUTOR                    2395 McGinty Road NW
                                           North Canton, OH 44720
LON'CHERIE D. BILLINGSLY
110 Central Plaza South, #510
Canton, OH 44702

*Delaney, J.*

{¶1} Defendant-Appellant Kevin Womack appeals his November 18, 2019 conviction and sentence by the Stark County Court of Common Pleas. Plaintiff-Appellee is the State of Ohio.

## FACTS AND PROCEDURAL HISTORY

## A Christmas Day Kidnapping and Burglary

{¶2} After dropping off a Christmas present to her uncle, M.B. returned to her home in Canton, Ohio, on December 25, 2018 at 1:30 p.m. M.B. was home alone. Around 2:00 p.m., she heard a knock at her front door and when she opened the front door, she saw a man holding a box wrapped in Christmas wrapping paper. She did not know the man, but he appeared to be in his forties, was wearing a hat, coat, and orange gloves, and had a salt-and-pepper beard.

{¶3} The man told M.B. he had a present to deliver to her and he needed her to sign for it. There was a note written on the package in black marker that said, "To [M.B.] from ?" When she opened the screen door, the man stepped through the door into the home. He closed the front door behind him. He asked M.B. if she was alone and M.B. said her roommate was home. M.B. became uncomfortable and she walked him back outside to the front porch. The man asked her again to sign for the present. M.B. went back into the home and wrote on a piece of paper, "No thank you, [M.B.]" to give to the man. When she handed him the note, M.B. tried to shut the door. The man pulled it open and shoved himself into the home.

{¶4} The man tried to grab M.B., and she fought with him. He said he had a gun, and he pulled a gun out of his pocket and put it up to her face. M.B. saw the gun had an

orange tip and she did not think it was a real gun. The man hit M.B. in the face with the gun several times. As they were fighting, M.B. became aware of another person in the home. She could smell a burning cigarette and felt the presence of someone behind her. The person behind her either hit her or pulled her hoody over her head and pulled her arms behind her back. She was knocked to the ground, tied with a scarf, and held face down on the ground while someone sat on top of her. She thought the person sitting on her was the man at the front door.

{¶5} While she was face down on the ground, M.B. could hear someone walking through the house, looking for something. M.B. begged the people to let her go and leave her home. She heard the person in the background ask, "where is it" and she thought the person meant cash. She said it was in her purse. The person sounded like a man. Someone picked M.B. up and put her in a closet. She heard the closet door slammed shut and the couch dragged in front of the closet door.

{¶6} When she thought the people had left the home, M.B. forced her way out of the closet. She saw the living room was a mess. She saw the attic door was open when it was usually closed and a window in the attic was open. The back door was open. The wrapped Christmas present was on the floor by the couch. She had put $225 in cash on the kitchen table, and she saw it was missing. She had $80 in her purse and it was also gone. She called a friend for support and then called 911.

{¶7} M.B. sought medical treatment the next day, where was diagnosed with a sprained wrist and contusions.

**DNA and a Lineup**

{¶8} After M.B. called 911, Officer Jeffrey Weller, a detective with the City of Canton Police Department, responded to the scene. He observed that M.B.'s home was in disarray, that she had contusions on her face, and packing tape stuck in her hair. M.B. gave a description to the responding officers of the man who came through her door. She said it was a white male, in his forties, salt-and-pepper beard, under 200 pounds, and a height range of five foot seven to five foot nine. Det. Weller collected the Christmas present, the packing tape from M.B.'s hair, and a hat. The physical evidence was forwarded to the Bureau of Criminal Investigation for DNA analysis.

{¶9} Detective Michael Walker of the Canton Police Department was assigned to the case. During the investigation, Det. Walker learned from the BCI that swabs of the folds of the wrapping paper on the Christmas present produced a DNA profile from Defendant-Appellant Kevin Womack. BCI also obtained a DNA profile from the swabs of the packing tape, which was identified as Raffael Wheeler. Det. Walker located Womack and obtained a search warrant to take a mouth swab from Womack for a DNA standard. The DNA standard from Womack was compared to the DNA profile from the wrapping paper and the profiles were identical. Det. Walker could not locate Raffael Wheeler.

{¶10} Det. Walker contacted M.B. to ask if she recognized the names of Kevin Womack or Raffael Wheeler. M.B. said she was not familiar with either name. Det. Walker instructed M.B. not to investigate either name.

{¶11} Det. Walker asked M.B. to come to the Canton Police Department the next day to review a photo line-up. He prepared a photo array, and a blind administrator handled the viewing. In the photo packet, he included a photo of Womack and five other

photos of individuals. Using a scale of one to five, five being the perpetrator without question, M.B. stated it was a five that she recognized the photo of Womack as the perpetrator. She looked through the photo lineup one time before making her identification.

{¶12} After M.B.'s identification, Det. Walker charged Womack and issued a warrant for his arrest.

### The Criminal Proceedings

{¶13} On May 10, 2019, the Stark County Grand Jury indicted Defendant-Appellant on one count of Aggravated Burglary, a first-degree felony in violation of R.C. 2911.11(A)(1) and one count of Kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(2). Womack entered a plea of not guilty to the charges.

### Motion to Suppress Identification Evidence

{¶14} On July 12, 2019, Womack filed a Motion to Suppress Identification Evidence. He contended the State did not comply with R.C. 2933.83, the codification of the process for photo lineups. In his motion, he argued that in the photo lineup, only Womack was wearing an orange jail uniform while the other individuals were wearing street clothes. He also argued that Det. Walker told M.B. the name of the suspect before the photo lineup. A hearing was held on the Motion to Suppress on July 23, 2019. The following evidence was presented at the hearing.

{¶15} On February 6, 2019, Womack was developed as a suspect after DNA connected him to the wrapping paper on the Christmas present. As part of his investigation, Det. Walker contacted M.B. and determined she did not know a person

named Kevin Womack. He told M.B. not to attempt to look up Kevin Womack because it could taint the photo lineup scheduled for the next day.

{¶16} Det. Walker prepared the photo lineup packet. He used Womack's booking picture found in CJIS (Criminal Justice Information Services) as opposed to a photograph from the BMV. In the January 3, 2019 CJIS photo that Det. Walker selected, Womack was wearing an orange jail uniform. The photo only shows Womack's head and the collar of the shirt. In the photo, there were no identifying marks on the jail uniform other than the orange color. There were other photos of Womack in the CJIS system that did not show Womack wearing an orange jail uniform. There was an October 21, 2018 CJIS photo of Womack that was close in time to the crime and in which his appearance was similar to the January 3, 2019 photo, but Womack was not wearing an orange jail uniform. Det. Walker said he chose not to use the October 21, 2018 photo because of how Womack's eyes appeared in the photo: "You look at his eyes, and it's, it's something that, that you may have said then, 'Well, look at his eyes.' You're – it kind of draws you there, and we don't want that. We're trying to make them as normal as possible and as close as possible." (T. 46).

{¶17} For the remaining five pictures of individuals to be used in the photo lineup, Det. Walker used a combination of methods to choose the subjects. He chose subjects that looked similar to M.B.'s description of the man who came into her home on December 25, 2018 and subjects who looked similar to Womack, the current suspect in the case based on the DNA hit. The men in the five photos were not wearing orange jail uniforms.

{¶18} Womack argued it was suggestive for Det. Walker to use the photograph of Womack in the orange jail uniform when other pictures of Womack were available, and

the other subjects were not wearing orange jail uniforms. He filed a supportive brief after the hearing.

{¶19} On August 27, 2019, the trial court denied the Motion to Suppress.

**Notice of Alibi**

{¶20} On July 29, 2019, Womack filed a Notice of Alibi. He stated that at the time of the alleged offense, Womack was at an address located in Canton, Ohio.

**Jury Trial**

{¶21} The matter came on for a jury trial on November 4, 2019. Prior to trial, Womack requested the trial court include in the jury instruction for the affirmative defense of duress. (T. 8). The trial court stated that whether the affirmative defense would be permitted as a jury instruction would be based on the evidence presented at trial. (T. 9). Womack also indicated that he may testify in his own defense, but he had been advised and he understood that the issue of identification raised in his Motion to Suppress may be waived upon appeal or rendered moot if he exercised his right to testify. (T. 13).

{¶22} M.B. testified as to the events on December 25, 2018. She identified Womack as the person who entered her home. Womack renewed his objection to the photo lineup. (T. 163).

{¶23} Womack took the stand and testified in his own defense. Prior to his testimony, his counsel formally withdrew Womack's Notice of Alibi. (T. 224). He also requested the trial court to include the jury instruction for the affirmative defense of duress. (T. 224).

{¶24} Womack testified that he was familiar with the person named Raffael Wheeler, whom he knew by the name of "Shot." (T. 270). Womack met Shot on Christmas

Eve in 2018 at a gambling hall. Shot was with a woman Womack knew from high school and he invited Womack to the woman's house. (T. 271). Womack drank a beer with Shot, but he felt like something had been added to the beer. (T. 272). The woman brought up an incident that resulted in Womack owing her fifty dollars. (T. 273). Shot became upset that Womack owed the woman fifty dollars and demanded Womack pay her the money immediately. (T. 273). Womack was scared because Shot "got really crazy all of a sudden." He showed Womack his gun by lifting his shirt. (T. 273-274). Womack said he did not have the money so Shot forced Womack to hand over his cell phone. Shot went through Womack's cell phone, logged on to Womack's Facebook account, and saw pictures of Womack's three young children. He took screen shots of the pictures of the children. (T. 274). Womack wanted to leave but Shot said he was not going anywhere until he got Shot the money. (T. 275). Shot next said if Womack delivered a package for him, he would let him live. (T. 276).

{¶25} Shot drove Womack and a man named JT to M.B.'s home. (T. 277). Womack went up to the front porch with the gift and the instructions from Shot to tell M.B. that he was paid to deliver the present. (T. 277). Shot and JT stood on the side of the house while Womack was at the front door. (T. 277). Womack testified that after he tried to give the present to M.B.:

> I tried to leave, I tried to get away because I knew, I tried to run away, I wanted to get away from those guys. I was leaving off of the porch and when I was leaving I turned around to run, I was going to run away. I turned around and they were right there, they barged in right there and pushed me right inside the house on top of [M.B.] and he had the gun out.

(T. 278). When asked if Shot was the one who was walking around the home asking, "where's the money," Womack said he did not know because he took off, "the two guys, him and JT went in the house and knocked me down on the ground." (T. 278). He then left the home by himself.

{¶26} After the defense rested, he requested the jury instruction for the affirmative defense of duress. (T. 296). The trial court denied the request because the evidence presented at trial did not support the inclusion of the instruction. (T. 309).

{¶27} The jury returned a verdict of guilty on the charges of Aggravated Burglary and Kidnapping. The trial court held a sentencing hearing on November 12, 2019, where the trial court sentenced Womack to nine years on the charge of Aggravated Burglary and eight years on the charge of Kidnapping, for an aggregate term of 17 years. (Sentencing Judgment Entry, Nov. 18, 2019).

{¶28} It is from this judgment that Womack now appeals.

**ASSIGNMENTS OF ERROR**

{¶29} Womack raises three Assignments of Error:

{¶30} "I. THE TRIAL COURT ERRED BY FAILING TO SUPPRESS SUSPECT IDENTIFICATION EVIDENCE OF THE APPELLANT THAT WAS UNDULY SUGGESTIVE AND CAUSED IT TO STAND OUT, IN VIOLATION OF R.C. 2933.83(A)(6)(A).

{¶31} "II. THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶32} "III. THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION FOR AFFIRMATIVE DEFENSE OF DURESS."

## ANALYSIS

### I. Motion to Suppress

{¶33} In his first Assignment of Error, Womack contends the trial court erred when it denied his Motion to Suppress the identification evidence as unduly suggestive. We disagree.

### Standard of Review

{¶34} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶35} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In

reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. *See State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *See Williams, supra*. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994).

### Identification Procedures

{¶36} Det. Walker conducted a photo lineup to determine whether M.B. identified Womack as the suspected perpetrator. R.C. 2933.83 sets forth the procedure to be followed when law enforcement administers a photo lineup to a witness for identification of a suspect. Womack argues on appeal that Det. Walker violated R.C. 2933.83(A)(6)(a) when he put together the photo lineup for M.B.'s review. The statute reads:

(A) As used in this section:

* * *

(6) "Folder system" means a system for conducting a photo lineup that satisfies all of the following:

(a) The investigating officer uses one "suspect photograph" that resembles the description of the suspected perpetrator of the offense provided by the

eyewitness, five "filler photographs" of persons not suspected of the offense that match the description of the suspected perpetrator but do not cause the suspect photograph to unduly stand out, four "blank photographs" that contain no images of any person, and ten empty folders.

{¶37} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Failure to strictly comply with R.C. 2933.83, however, does not render the pretrial identification procedure per se impermissibly suggestive. *State v. Shaw*, 5th Dist. Muskingum No. CT2018-0053, 2019-Ohio-1674, ¶ 22. Rather, all facts and circumstances must be considered. *State v. Qirat*, 5th Dist. Licking No. 2015-Ohio-863 ¶ 33 citing *State v. Murphy*, 91 Ohio St.3d 516, 534, 2001-Ohio-112, 747 N.E.2d 765. The provisions of R.C. 2933.83 do "'not provide an independent basis upon which to suppress evidence, and a trial court errs in solely relying on the statute in suppressing an identification.'" *State v. E.T.*, 10th Dist. No. 17AP-828, 2019-Ohio-1204, 134 N.E.3d 741, 2019 WL 1468769, ¶ 52.

{¶38} If the defendant argues the identification procedure should be suppressed, the defendant must first show that the identification procedure was unduly suggestive. *State v. Green*, 2nd Dist. Montgomery No. 28614, 2020-Ohio-5206, ¶ 20. If the defendant shows the pretrial identification procedure was unduly suggestive, the trial court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedures. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "[T]he factors to be considered in evaluating

the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.*

{¶39} In his appeal, Womack argues Det. Walker violated R.C. 2933.83(A)(6)(a) in two ways. First, he provided M.B. with the name of the suspect prior to the photo lineup. Second, Det. Walker used a photo of Womack for the photo lineup in which he wore an orange jail uniform. Womack contends Det. Walker's actions made the pretrial identification procedure unduly suggestive.

{¶40} The trial court addressed these arguments in its August 27, 2019 judgment entry overruling the Motion to Suppress. The trial court first found that while it did not condone the procedure of revealing the suspect's name to the victim before a photo lineup, the procedure was not unduly suggestive. We find Det. Walker's explanation of why he gave M.B. Womack's name prior to the photo lineup supports the trial court's judgment. Det. Walker stated:

A. I told her two names. And I was asking her because I wanted to find out if she knew these people –

Q. Uh-huh.

A. – prior to because of – if they were people that had – or she had knowledge of from this – from this package that was left. We – a lot of times there's reasons behind. And there was even question of – we even questioned, I went into questioning her about prior drug usage, prior other usage. She's a bartender, is "if you knew these people." And that would

disclude [sic] if – then if he was someone that she knew that could have

potentially been there to have touched something, even that evidence, then

he could have been excluded, and that's why there also was, "Don't – if you

don't know these, do not look up the name, don't attempt to. Come in, we

want to talk to you."

(T. 58-59).

{¶41} The record shows that Det. Walker gave M.B. the name of the suspect to

determine if the suspect could be excluded from the investigation. There was no evidence

presented that after she was given his name, the victim researched Womack prior to the

photo lineup.

{¶42} As to the use of Womack's photo showing him wearing an orange jail

uniform, the trial court viewed the photo array compiled by Det. Walker. The trial court

also viewed the other available photos of Womack, including the October 21, 2018 photo.

The January 3, 2019 photo of Womack used in the photo lineup showed him wearing an

orange shirt with a collar and a white t-shirt underneath. The photo did not reveal it was

a jail-issued article of clothing. Womack was smiling in the picture. Det. Walker did not

use the October 21, 2018 photo due to Womack's facial expression:

You look at his eyes, and it's, it's something that, that you may have said

then, 'Well, look at his eyes.' You're – it kind of draws you there, and we

don't want that. We're trying to make them as normal as possible and as

close as possible.

(T. 46). Womack is wearing a gray t-shirt in the October 21, 2018 photo. Womack is not

smiling, and his eyes are opened very wide, drawing the viewer's gaze to his eyes. We

agree with the trial court that of the two photos of Womack, Womack did not unduly stand out in the January 3, 2019 photo as compared to the October 21, 2018 photo.

{¶43} Even though the trial court determined that Womack failed to establish the procedure for the photo lineup was unduly suggestive, the trial court next considered the *Neil v. Bigger* factors to determine whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedures. The trial court considered M.B.'s opportunity to observe Womack during the crime, her description of him to the police, and the relatively short duration of time between the crime and the photo lineup (45 days). The trial court found the factors reduced the likelihood of misidentification.

{¶44} According to the information provided by M.B. to the investigating officers, she had a good opportunity to observe Womack during the crime because he came to her door, spoke with her, and she fought with him when he came into her home. Her description of Womack did not vary when she spoke with different officers about the crime. When M.B. identified Womack in the photo lineup, she reviewed the photo array one time and identified Womack as a "five" that he was the perpetrator. Considering the totality of the circumstances, we agree the identification was also reliable.

{¶45} Womack's first Assignment of Error is overruled.

## II. Affirmative Defense of Duress

{¶46} For ease of discussion, we address Womack's third Assignment of Error and then we will analyze his second Assignment of Error. In his third Assignment of Error, Womack argues the trial court abused its discretion when it denied his request for a jury instruction on the affirmative defense of duress. We disagree.

{¶47} We review a trial court's refusal to provide a requested jury instruction for an abuse of discretion. *State v. Thomas*, 5th Dist. No. 2015CA00037, 2015-Ohio-4932, 50 N.E.3d 967, 2015 WL 7709994, ¶ 35 citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991); *see State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989)." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, 2015 WL 5728458, ¶ 240.

{¶48} To establish the affirmative defense of duress,

the defendant must demonstrate that he was compelled to commit the crime under threat, by another person, of imminent death or serious bodily injury. *State v. Lawson*, Montgomery App. No. 2215, 2008-Ohio-1311, ¶ 19 citing *State v. Elijah* (July 14, 2000), Montgomery App. No. 18034. "The force used to compel the actor's constant must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw." *Id.* citing *State v. Getsy*, 84 Ohio St.3d 180, 199, 1998-Ohio-533. Although the defendant must subjectively believe that he is being threatened with imminent death or serious bodily harm if he does not commit the crime, that belief must be

objectively reasonable based on the evidence. *Elijah*, supra; *State v. Doakes*, Montgomery App. No. 18811, 2001-Ohio-6995.

*State v. Jones*, 2nd Dist. Clark No. 2018-CA-18, 2019-Ohio-239 quoting *State v. Longstreth*, 2nd Dist. Montgomery No. 24287, 2011-Ohio-1825, ¶ 12.

{¶49} The time frame for which a defendant may claim the experience of duress is limited:

> For a duress defense to be viable, "[t]he force and harm threatened must be *in praesenti*; fear of future harm is not a sound basis for the defense of duress." *State v. Hackley*, 2d Dist. Montgomery No. 11407, 1990 WL 119292, *5 (Aug. 15, 1990), citing *State v. Good*, 110 Ohio App. 415, 419, 165 N.E.2d 28 (10th Dist. 1960); s*ee also State v. Simes*, 8th Dist. Cuyahoga No. 103672, 2016-Ohio-7300, ¶ 40 ("Fear of future harm is not sufficient to prove the affirmative defense of duress. * * * Appellant's fear that Towns would 'make good' on his threat at some undetermined time in the future is insufficient to support a duress instruction."). "The Ohio Supreme Court has made clear that the defense of duress is 'strictly and extremely limited in application and will probably be effective in very rare occasions.'" *State v. Zhang*, 6th Dist. Wood No. WD-15-018, 2016-Ohio-975, ¶ 19, quoting *State v. Cross*, 58 Ohio St.2d 482, 488, 391 N.E.2d 319, 323 (1979).

*State v. Jones*, 2nd Dist. Clark No. 2018-CA-18, 2019-Ohio-239, 2019 WL 337003, ¶ 12; *See also State v. Hayes*, 5th Dist. Knox No. 18CA10, 2019-Ohio-1629, ¶ 26.

{¶50} Womack testified he subjectively believed that he was being threatened with imminent death or serious bodily harm if he did not commit the crime; the trial court, however, must determine if that belief was objectively reasonable based on the evidence. Womack said he did not have a choice but to commit the crime because he believed Shot was going to kill him. (T. 290). When Shot demanded the fifty dollars from Womack, he brandished a gun at Womack and took his cell phone. Counsel asked if Shot made any threats against him or any of his family or friends whose contact information was in the cell phone. (T. 274). Womack answered that the gun was sitting on a table across from him and Shot looked through his Facebook account, taking screen shots of the photos of Womack's children. (T. 274). Womack told Shot he wanted to leave and Shot said he wasn't going anywhere until Womack got him the fifty dollars. (T. 275). Shot told Womack that if he delivered the package to M.B., Shot would let him live. (T. 276).

{¶51} Womack testified that Shot drove him to M.B.'s home. (T. 277). Womack went to the front door by himself and Shot and JT stood on the side of the house. (T. 277). Shot and JT were out of view of Womack and M.B. (T. 277). After he tried to give the Christmas present to M.B., Womack testified that he tried to leave and get away from Shot and JT. "I was leaving off of the porch and when I was leaving I turned around to run, I was going to run away. I turned around and they were right there, they barged in right there and pushed me right inside the house on top of [M.B.] and he had the gun out." (T. 278). The three men entered the house. (T. 278). Womack testified he did not know who asked where the money was because he left the house. (T. 279). Womack was asked:

Q. Okay. During the entirety of this incident was there ever a point where you were not – or rather where Shot was not actively threatening you in some way, shape or form, whether verbally or just by brandishing the firearm?

A. Ever since he pulled the gun on me and took my phone I didn't have a choice, I didn't have a choice in the matter of what I did unless I wanted to get shot.

(T. 279).

{¶52} When Womack was arrested, he did not tell the police that he was forced to commit the crime. (T. 297). Womack said that he did not tell the police because Shot had access to his family and personal information. He was scared to tell the police because he was afraid Shot would kill his children or the mother of his children. (T. 287-288).

{¶53} Based on Womack's testimony, the trial court concluded that Womack had a means of withdrawing or escaping from the threat posed by Shot. The trial court recited the facts it utilized to determine that Womack failed to establish the threat was of such a nature that he could not safely withdraw:

Then we take to the scene of the young lady's residence. The way I understood Mr. Womack's testimony * * * he took this package, the Defendant went to the front porch with the gift and knocked on the front door.

And the words I wrote in quotes were, "He was standing outside the side of the house. He was out of the view of myself and Ms." – is it [M.B.] * * *?

* * * So at that point the Defendant's got several options. He can run, he can go inside and call for help, he can ask for help, there's a number of different things that he could do.

His argument really doesn't hold when you consider her testimony * * * because she indicates that he then came into the house.

And if you believe her testimony, he's into the house for a period of five minutes, he feels uncomfortable, he pulls out what she believes may be a gun, and she indicates that the door is closed, he struggles with her.

He would have had the opportunity to go out the back door, he's had the opportunity to close the door, to call 911, she asked him why don't we go outside, he wasn't even in the same view of this gentleman.

(T. 299-300).

{¶54} Upon our review of the record, we agree with the trial court's conclusion that the evidence did not support Womack's contention that the affirmative defense of duress was applicable to the facts of the case. We do not dispute that Womack subjectively believed he and his family were being threatened with imminent death or serious bodily injury. We note that the Sixth District Court of Appeals has recognized that duress may be found when the threat is made against the defendant's family. *State v. Cowan*, 6th Dist. Wood No. WD-14-026, 2015-Ohio-2101, 2015 WL 3488289, ¶ 28; *State v. Luff*, 85 Ohio App.3d 785, 804, 621 N.E.2d 493 (6th Dist.1993) (stating that jury instruction on duress should have been given where defendant testified that someone threatened to destroy his family). Our research indicates, however, that only the Sixth District Court of Appeals has extended the definition of duress to include the threat of imminent death or

serious bodily injury to a defendant's family. However, the force of harm threatened must be in the present; fear of future harm cannot be the basis for the threat of duress. There was no evidence presented that Shot was a present threat to Womack's family, there was only a possible threat of future harm.

{¶55} Womack's argument for application of the defense of duress fails because Womack had the ability to safely withdraw from the harm before committing the offenses of aggravated burglary and kidnapping. He could have withdrawn or escaped after he arrived at M.B.'s home. According to Womack's testimony, Shot and JT were on the side of the house while Womack was alone on the front porch. Shot and JT were out of his view from the front porch. There was no evidence that Shot was pointing his gun at Womack while Womack was on the front porch. M.B. testified that Womack entered her house alone and closed the front door. In the home with only he and M.B. present, Womack could have asked M.B. for help or left the home through another door. While on the front porch, Womack testified he tried to leave but he was pushed into the home by Shot and JT. After Shot and JT entered the home, Womack testified he did in fact leave the home without expressing a fear of harm or even with the knowledge that any money was found, which would have released him from his debt to Shot.

{¶56} The defense of duress is strictly and extremely limited in application. Upon the facts of this case, we find the trial court did not abuse its discretion by not giving the jury instruction for duress. We overrule Womack's third Assignment of Error.

## II. Ineffective Assistance of Counsel

{¶57} Womack argues in his second Assignment of Error that he received ineffective assistance of trial counsel. We disagree.

{¶58} A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, to prevail on a claim of ineffective assistance of counsel, Womack must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, Womack must show counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

{¶59} Womack contends on appeal that his trial counsel was ineffective because he did not subpoena M.B.'s roommate as a witness. He states the roommate could have answered questions left open at trial, such as why was the attic door and window open, how did the second man get into the home after Womack, and how did Shot know M.B.'s name and address? The roommate's testimony, Womack argues, could have been important to his affirmative defense of duress.

{¶60} Based on our determination there was no abuse of discretion by the trial court to determine the evidence did not support the jury instruction for the defense of duress, we find Womack's trial counsel was not ineffective for failing to call the roommate as a witness. The defense of duress failed because the evidence showed that Womack could have safely withdrawn from the threat posed by Shot. Knowing why the attic door and window were open or how Shot knew M.B. would not have supported Womack's argument as to duress.

{¶61} Womack's second Assignment of Error is overruled.

## CONCLUSION

{¶62} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Delaney, J.,

Gwin, P.J. and

Hoffman, J., concur.